**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**UNITED STATES OF AMERICA**

      – against –

**AHMED ABDEL SATTAR,**
    **a/k/a "Abu Omar,"**
    **a/k/a "Dr. Ahmed,"**
**LYNNE STEWART, and**
**MOHAMMED YOUSRY,**

               Defendants.
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**S1 02 Cr. 395 (JGK)**

<u>**OPINION & ORDER**</u>

**JOHN G. KOELTL, District Judge:**


On February 10, 2005, after a lengthy trial, a jury found each of the defendants – Ahmed Abdel Sattar ("Sattar"), Lynne Stewart ("Stewart"), and Mohammed Yousry ("Yousry") – guilty on each of the counts in which they were charged in the seven-count superseding indictment ("S1 Indictment").

Count One of the S1 Indictment charged Sattar, Stewart, and Yousry with conspiring to defraud the United States in violation of 18 U.S.C. § 371.  Count Two charged Sattar with conspiring to murder and kidnap persons in a foreign country in violation of 18 U.S.C. § 956.  Count Three charged Sattar with soliciting persons to engage in crimes of violence in violation of 18 U.S.C. § 373.  Count Four charged Stewart and Yousry with conspiring, in violation of 18 U.S.C. § 371, to provide and conceal material support to be used in preparation for, and in carrying out, the conspiracy alleged in Count Two.  Count Five charged Stewart and Yousry with a substantive

count of providing and concealing material support to the Count Two conspiracy, in violation of 18 U.S.C. §§ 2339A and 2. Counts Six and Seven charged Stewart with making false statements in violation 18 U.S.C. § 1001. See United States v. Sattar, 272 F. Supp. 2d 348 (S.D.N.Y. 2003) ("Sattar I"); United States v. Sattar, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) ("Sattar II"). The jury found that the conspiracy charged in Count Two was solely a conspiracy to murder – and not to kidnap persons – in a foreign country, and that the crimes solicited as charged in Count Three were murder and conspiracy to murder.

At the conclusion of the Government's case, all defendants moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on the grounds that the evidence was insufficient to sustain a conviction. At that time, Stewart argued, among other things, that the evidence was insufficient because the conspiracy to murder and kidnap persons in a foreign country had not been proved because the locus of the murder or kidnapping might be a place, such as Palestine, that is not an internationally recognized country. At the Government's request, the Court reserved decision on the motions and the defendants proceeded with their defense, including the testimony of each of the three defendants. At the conclusion of all of the evidence and after the jury verdict, the defendants again moved for judgment of acquittal, and the Court reserved judgment.

Having obtained a timely extension of time to file motions, Stewart has filed a renewed motion for a judgment of acquittal pursuant to Rule 29, for a new trial pursuant to Federal Rule of Criminal Procedure 33, for arrest of judgment pursuant to Federal Rule of Criminal Procedure 34, and in the alternative, for discovery on Stewart's selective prosecution claim. Defendants Sattar and Yousry join in the motions to the extent that they affect them. For the reasons stated below, the motions are denied.

## I.

Each of the defendants has moved for a judgment of acquittal on each of the counts in which they are charged, but the only substantive arguments with respect to the insufficiency of the evidence have been raised by Stewart with respect to the Counts in which she is charged - namely Counts One, Four, Five, Six, and Seven.

## A.

To succeed on a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rule of Criminal Procedure, the defendant must show that no rational trier of fact, viewing the evidence in the light most favorable to the Government, could have found the defendant guilty beyond a reasonable doubt of the essential elements of the crimes charged. United States v. Desena, 287 F.3d 170, 176 (2d Cir. 2002). A defendant making an insufficiency claim "bears a

very heavy burden."  Id. at 177; see also United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir. 1991) (collecting Second Circuit cases).

In considering the sufficiency of the evidence, the Court must "view the evidence presented in the light most favorable to the government, and … draw all reasonable inferences in its favor." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).  The Court must analyze the pieces of evidence "not in isolation but in conjunction," United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," the Court must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury."  Autuori, 212 F.3d at 111 (internal citation omitted).  Thus, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 2001).  The jury's verdict "may be based entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995); see also United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002)

(elements of conspiracy can be established by circumstantial evidence); Macklin, 927 F.2d at 1277 (same).

**B.**

To the extent that the defendant also makes a motion pursuant to Rule 33 of the Federal Rule of Criminal Procedure based on an alleged insufficiency of the evidence, the standard is also an exacting one. A court will grant a new trial only "in the most extraordinary circumstances." United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (citing United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992)). In evaluating the sufficiency of the evidence for purposes of Rule 33, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal citation omitted). There must be "a real concern that an innocent person may have been convicted." Id. While the Court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it must nonetheless "exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." Id. (internal citation and quotation marks omitted).

**C.**

In deciding the motions to dismiss made at the conclusion of the Government's case, the Court must decide the motions based on

the evidence at the time the ruling was reserved.  See Fed. R. Crim.

P. 29(b).  In deciding the subsequent motions, the Court can

consider all of the evidence, and Stewart refers in her written

submission to the "totality of the evidence."  Stewart Mem. at 8.

Stewart specifically relies on her testimony that she was only

engaged in the zealous representation of her client and was not

attempting to deceive the Government.  Stewart Mem. at 51.

In considering the totality of the evidence, the jury is

entitled to disbelieve a defendant's testimony and "use its

disbelief to supplement the other evidence against [the defendant],"

United States v. Stanley, 928 F.2d 575, 577 (2d Cir. 1991), and may

in light of all of the evidence conclude that the defendant's

testimony was false and thereby infer the defendant's guilt.  See

Morrison, 153 F.3d at 50; United States v. Friedman, 998 F.2d 53, 57

(2d Cir. 1993).  This decision therefore focuses on the evidence at

the conclusion of the Government's case and refers to the remainder

of the evidence, particularly Stewart's testimony, as it relates to

her motions after the conclusion of all of the evidence.

## II.

Count One of the S1 Indictment alleges that, from about June

1997 through about April 2002, defendants Sattar, Stewart, and

Yousry, as well as Sheikh Omar Abdel Rahman ("Abdel Rahman") and

Rifa'i Ahmad Taha Musa, a/k/a "Abu Yasir" ("Taha"), together with

others known and unknown, conspired to defraud the United States, in violation of 18 U.S.C. § 371, by obstructing the Department of Justice and the Bureau of Prisons in the administration and enforcement of the Special Administrative Measures ("SAM's") applicable to the imprisoned Sheikh Abdel Rahman. Stewart argues that there was insufficient evidence both of the existence of the Count One conspiracy and of her specific intent to join the conspiracy. In particular, Stewart argues that her actions were not calculated to deceive the Government, but rather to defy it openly. None of these arguments have merit.

The Court instructed the jury that, "in this case, the term 'conspiracy to defraud the United States' refers to charges that the defendants agreed to [employ] deceitful or dishonest means toward the Department of Justice and its agency, the Bureau of Prisons, in order to obstruct, interfere with, impair, impede, or defeat the administration and enforcement of Special Administrative Measures upon inmate Sheikh Omar Abdel Rahman." (Tr. 12306-07.) See United States v. Ballistrea, 101 F.3d 827, 831 (2d Cir. 1996).

The evidence at trial was more than sufficient to show that Stewart conspired with Yousry, Sattar, Abdel Rahman, and others to defraud the United States Department of Justice and the Bureau of Prisons. Stewart's knowledge of the existence of the conspiracy to defraud and her intent to participate in it were inferable from her conduct and her statements.

**A.**

The evidence showed that the Special Administrative Measures imposed upon Sheikh Abdel Rahman prohibited him from, among other things, passing or receiving communications from third persons with few exceptions.  Abdel Rahman was permitted to communicate with his attorneys, but only with respect to legal matters.  He could receive visits only from his attorneys and certain family members, and could communicate by telephone only with his legal spouse and his attorneys.  Any correspondence to or from Abdel Rahman was required to be screened by the FBI to determine whether it contained either overt or covert requests for illegal activities, or actual or attempted circumvention of the SAMs.  The SAMs also strictly prohibited Abdel Rahman from communicating with the news media in any manner, including through his attorneys.  The SAMs required the attorneys of record for Abdel Rahman to sign an affirmation that counsel and anyone acting at counsel's behalf would abide by the SAMs.  (GX 2-6, 11, 13.)

The evidence further proved that in signing the attorney affirmations, Stewart affirmed, among other things, that she and her staff would abide by the SAMs; that she would not use her meetings with Abdel Rahman to pass messages between him and third parties; that she would not pass his messages to the media; and that she would be accompanied by a translator during prison visits only for

the purpose of communicating with Abdel Rahman concerning legal matters. The affirmations specifically provided that the attorney understood that the Bureau of Prisons was relying on the sworn representation in affording Abdel Rahman the opportunity to meet or speak with the attorney. (GX 3, 7, 12.)

Stewart signed the attorney affirmations, and returned them to the United States Attorney's Office. (GX 3, 4, 6, 7, 12.) Significantly, she signed affirmations dated May 16, 2000 and May 7, 2001, which were the false statements that served as the basis for the charges in Count Six and Seven against her. (GX 7, 12.) There was substantial evidence that Yousry and Sattar were also aware of the SAMs and their restrictions on Abdel Rahman's ability to communicate with them.

A rational jury could find that Stewart and her co-defendants knew of the existence of the SAMs and the limitations the SAMs placed on Abdel Rahman's ability to communicate with others. A rational jury could find that, despite this knowledge, the defendants acted together to employ deceitful or dishonest means towards the Department of Justice and the Bureau of Prisons in order to obstruct the administration and enforcement of SAMs upon Abdel Rahman. The defendants did this primarily by smuggling messages to and from Abdel Rahman and by disseminating his statements to the media in the form of two press releases in June 2000, announcing his withdrawal of support for a cease-fire.

**1.**

In March 1999, Stewart and Yousry visited Abdel Rahman at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"). (GX 305, 306.) Prior to the visit, Stewart had signed and sent to the United States Attorney's Office for the Southern District of New York an affirmation making the representations explained above. (GX 3.) A rational jury could have found that Stewart and Yousry used this visit to bring a message to Abdel Rahman seeking his support for Taha's position to end the Islamic Group's cease-fire. (GX 1007X at 4-5.)

The Islamic Group ("IG") is an organization that had been designated a "foreign terrorist organization" by the Secretary of State. Under the cease-fire, the IG had suspended terrorist operations in Egypt in an effort to persuade the Egyptian government to release IG leaders, members, and associates who were in prison in Egypt. See, e.g., GX 1111 at 8-22. Prior to the March 1999 visit to Abdel Rahman, Sattar had received a letter from two individuals named Gamal Sultan and Kamal Habib, who requested an opinion from Abdel Rahman as to whether the Islamic Group should form a political party in Egypt. (GX 1005X at 2-4.) A rational jury could find that, during the course of the March 1999 visit, Stewart and Yousry relayed to Abdel Rahman the requests from Taha and from Sultan and Habib, and received Abdel Rahman's response. (GX 2415-6T.)

In response to Sultan's and Habib's letter, Abdel Rahman rejected the proposal that the Islamic Group form a political party. Abdel Rahman stated that the "cessation of violence" was a "matter of tactics and not of principle." (GX 2415-6T; see also GX 1007X at 3, 6-7.) In response to Taha's request for Abdel Rahman's support in ending the cease-fire, Abdel Rahman stated that he had "no objection," even though others were calling for the halt of violence. Significantly, Abdel Rahman instructed that "[n]o new charter, and nothing should happen or be done without consulting me, or informing me." (GX 1007X at 4-5.)

Following the visit, Sattar relayed Abdel Rahman's messages to both Taha and Mustafa Hamza ("Hamza"). (GX 1007X at 3-7, 9-10; GX 1009X at 2-3.) Taha told Sattar that he wanted the letter for him "a little stronger." (GX 1009X at 2.)

**2.**

Stewart and Yousry next visited Abdel Rahman at FMC Rochester on May 19 and 20, 2000. Three days before that visit, on May 16, 2000, Stewart signed an attorney affirmation again making the representations explained above. (GX 6, 7.) Stewart submitted the attorney affirmation to the United States Attorney's Office on May 26, 2000, ten days after she signed it, and six days after the May 2000 prison visit. A rational jury could find that during the visit, Stewart violated her affirmation.

The May 2000 visit was, unbeknownst to Stewart and Yousry, recorded on videotape. During that visit, Stewart and Yousry secretly brought into the prison a number of letters for Abdel Rahman. (GX 1706X at 46-48; GX 1707X at 27-28, 33-36.) Among the correspondence was a letter from Sattar containing a message from Taha seeking Abdel Rahman's support in ending the cease-fire. (GX 1707X at 33-36.) In the letter, Sattar and Taha asked Abdel Rahman to take a "more forceful position," and to "dictate some points" that could be announced by Stewart to the media. (GX 1707X at 33-36.)

On May 19, 2000, the first day of the visit, Stewart had Yousry read to Abdel Rahman the letter from Sattar with Taha's message. Stewart testified that Yousry translated Sattar's letter with Taha's message to her before their visit with Abdel Rahman on May 19, 2000. (Tr. 7766.) Stewart, who had brought Sattar's letter into the prison concealed in a legal pad, handed the letter to Yousry shortly before Yousry read it to Abdel Rahman. When Stewart passed the letter to Yousry, she mentioned to him that Abdel Rahman would need to think about his response to the letter, and Yousry so informed Abdel Rahman. (GX 1707X at 27-28.) Just before Yousry was about to read Taha's message to Abdel Rahman, Yousry saw the prison guards outside the window of their meeting room and alerted Stewart to that fact. Yousry instructed Stewart to talk to Abdel Rahman, as if they were engaged in a conversation. Stewart and Yousry then laughed

while acknowledging that if the prison guards discovered that they were reading the letter to Abdel Rahman, they would be "in trouble." (GX 1707X at 29.)  While Yousry read Sattar's and Taha's message to Abdel Rahman, Stewart and Yousry actively concealed that fact from the prison guards.  Stewart pretended to be participating in the conversation with Abdel Rahman by making extraneous comments about food and eating.  (GX 1707X at 29-36.)

On May 20, 2000, during the second day of the visit, Abdel Rahman dictated letters to Yousry in response to Taha's and Sattar's message.  In his letter, Abdel Rahman stated, among other things, "what use is the initiative … where we declared the halt of violence … and the government continues to arrest the Islamic Group members, puts them to military trials, continues to execute and re-arrest them?"  (GX 1710X at 48.)  He urged that the opposition voice be heard and that Taha should be given "his natural right … as head of the Group … [if not] the least is to have the person in charge consult with him …."  (GX 1710X at 49; see also GX 1711X at 30-33.)

During Abdel Rahman's dictation, Stewart actively concealed the conversation between Abdel Rahman and Yousry from the prison guards by again engaging in covering noises.  Among other things, Stewart again periodically interrupted the dictation with extraneous comments and told Yousry to talk to her from time to time "for the sake of talking about something."  (GX 1710X at 53.)  After the visit, Stewart and Yousry brought out of the prison Abdel Rahman's

dictated letters in response to Taha's and Sattar's message. Once
back in New York, the letters were provided to Sattar, who relayed
Abdel Rahman's message to Hamza and Taha. (GX 1093X at 1-5; GX
1094X at 6-7.) Stewart testified that, after the visit, Yousry
translated for her Abdel Rahman's response to Sattar's and Taha's
letter. (Tr. 8300.) Sattar told Taha that while the details of
Abdel Rahman's message were relayed to Taha and Hamza, and the
lawyer would meet with the press, the details of the message would
not be conveyed publicly. (GX 1094X at 2-3.)

Following the May 2000 visit, Sattar spoke with Yousry, Taha,
and Yassir Al-Sirri ("Al-Sirri") about the release of Abdel Rahman's
statement. (GX 1101X, 1102X, 1268X, 1103X). During a June 4, 2000
telephone conversation with Taha, Sattar told Taha that the release
of Abdel Rahman's statement would not impact Sattar but "it will
have an impact on the person would issued the statement." (GX 1101X
at 8.) On the next day, June 5, 2000, Sattar spoke with Yousry
about issuing a press release with Abdel Rahman's message. During
their conversation, Sattar stated that he had spoken with Stewart
about the content of the press release and he told Yousry also to
speak with Stewart about it. Yousry suggested that the three of
them meet to discuss the press release. (GX 1102X at 2-5.) On June
11, 2000, Sattar spoke with Al-Sirri about Abdel Rahman's withdrawal
of support for the cease-fire, and about how to time the press

release in order to maximize the value of the news coverage. (GX 1268X at 7.)

On June 13, 2000, Stewart and Sattar relayed Abdel Rahman's withdrawal of support for the cease-fire to Reuters reporter Esmat Salaheddin, who was based in Cairo, Egypt. (Tr. 5569-72, 5605-06.) Salaheddin testified at trial as to his conference call with Stewart and the accuracy of his article. (Tr. 5569-75.) In disseminating Abdel Rahman's statement, Stewart told Salaheddin that "Abdel Rahman is withdrawing his support for the cease-fire that currently exists." (Tr. 5574, 5617; GX 524.) Stewart also told Salaheddin that "[prison authorities] may bar me from visiting him because of this announcement." (Tr. 5574; GX 9.) The following day, Reuters and various Middle Eastern newspapers published articles about Abdel Rahman's withdrawal of support for the Islamic Group's cease-fire in Egypt. (GX 9; GX 1115 at 2.)

As part of her case, Stewart entered into evidence a transcript that showed that while discussing with Yousry the fact that there were IG members blaming Sattar in the Arabic media for disseminating Abdel Rahman's statement and calling it a fabrication, Stewart states that she was "risking my whole career" in disseminating Abdel Rahman's statement, and that she was not doing it "lightly." (DX LS-701T at 5-6.)

Stewart's dissemination of Abdel Rahman's withdrawal of support for the cease-fire and its publication in the media produced

conflict within the Islamic Group between pro-cease-fire and pro-violence factions, with pro-cease-fire advocates denying that Abdel Rahman had issued the withdrawal. (GX 1111X at 4-22; GX 1114X at 2; GX 1250X at 1-4.) Stewart and Sattar responded by issuing Abdel Rahman's reaffirmation of his withdrawal of support for the cease-fire on June 21, 2000, by relaying it to Salaheddin. (GX 2663; GX 1151X at 1-3; GX 1152X at 1-4; GX 1153X at 1-4; GX 1155 at 1-3.) The statement reaffirmed that everything that was said in the previous statement was correct and that Abdel Rahman said those things. The statement also stated, "… I did not <u>cancel</u> the cease-fire. I do withdraw my support to the initiative. I expressed my opinion and left the matters to my brothers to examine it and study it because they are the ones who live there and they know the circumstances where they live better than I. I also ask them not to repress any other opinion within the Gama'a, even if that is a minority opinion." (GX 2663 (emphasis in original).) The jury could reasonably find that the "other opinion" was a reference to Taha.

### 3.

On July 13 and 14, 2001, Stewart and Yousry visited Abdel Rahman at FMC Rochester. Prior to this visit, on May 7, 2001, Stewart signed and faxed to the United States Attorney' Office in the Southern District of New York an affirmation in which she agreed

to abide by the terms of the SAMs then in effect and made the other representations explained above.  (GX 12.)

This visit was also recorded on videotape without the knowledge of Stewart and Yousry.  During this visit, at Sattar's request, Stewart and Yousry brought a message to Abdel Rahman from his son, Mohammed Abdel Rahman, which urged Abdel Rahman to continue to support an end to the cease-fire.  They also secretly brought to Abdel Rahman messages and correspondence from other persons.  (GX 1229X at 2-3; GX 1716X at 62-63; GX 1720X at 14-22.)

During this visit, Stewart and Yousry also told Abdel Rahman that Sattar had been informed that the U.S.S. Cole had been bombed on Abdel Rahman's behalf, and that Sattar was asked to convey to the United States Government that other things would follow if it did not free Abdel Rahman.  (GX 1717X at 11-13.)  Abdel Rahman said that negotiations should go through a lawyer.  (Id. at 12.)  While Yousry was informing Abdel Rahman about these things, Stewart actively concealed the conversations between Yousry and Abdel Rahman from the prison guards by, among other things, tapping a water bottle on the table while stating that she was "just doing covering noises."  (GX 1717X at 12.)

### B.

All of the evidence presented was more than sufficient to establish, beyond a reasonable doubt, that Stewart, Yousry, and Sattar participated in a conspiracy to defraud the United States.

From the evidence of the concerted actions of Stewart, Yousry, and Sattar to relay Sattar's, Taha's, and Mohammed Abdel Rahman's messages to and from Abdel Rahman during prison visits, in violation of the SAMs, a rational jury could find the existence of the Count One conspiracy to defraud the United States regarding the SAMs. A rational jury could further infer the existence of the conspiracy from Stewart's and Yousry's concerted efforts to conceal from the prison guards and officials their conversations regarding Taha's and Sattar's messages to Abdel Rahman and Abdel Rahman's responses to them. A rational juror could also infer from the actions and words of each of the defendants that they knowingly participated in the conspiracy.

Stewart argues that there was insufficient evidence to prove the existence of a conspiracy to defraud the Government because Stewart's violations of the SAMs were entirely open and notorious and that this shows that Stewart's actions were designed to "<u>defy</u>, and not to <u>defraud</u>." (Stewart Reply Mem. at 6.) Stewart points in particular to her public dissemination of the press release following the May 2000 prison visit. This argument has no merit. A reasonable jury could certainly find that Stewart gained access to Abdel Rahman by deceit and dishonest means. Without her agreement to abide by the SAMs and the other representations contained in her affirmations, she knew that she would not have been allowed to visit Abdel Rahman. Therefore, a reasonable jury could find that Stewart

employed the dishonest means of signing and submitting false affirmations in order to gain access to the prison.  Moreover, given the evidence of deliberate attempts to conceal that she was binging messages into the prison and secretly obtaining responses to take out of the prison, a reasonable juror could find that Stewart was using dishonest means in order to take Abdel Rahman's messages out of prison in violation of the SAMs.

This was not a case of defiance of the SAMs as opposed to the dishonest effort to violate them.  As the Court noted in two prior opinions, Stewart had ample opportunities to challenge the SAMs and the attorney affirmations within the legal system, but chose not to do so.  <u>Sattar II</u>, 314 F. Supp. 2d at 310; <u>Sattar I</u>, 272 F. Supp. 2d at 372.

Stewart also argues that there was no conspiracy to defraud because the Government actually recorded the May 2000 and July 2001 prison visits.  This argument is also unavailing.  The Government was not required to prove that the Government was actually defrauded to establish a Section 371 conspiracy to defraud.  <u>See, e.g.</u>, <u>Ballistrea</u>, 101 F.3d at 832 (setting forth elements of Section 371 offense and citing <u>United States v. Caldwell</u>, 989 F.2d 1056, 1059 (9th Cir. 1993), which, in turn, noted that a Section 371 violation "need not involve any detrimental reliance by the government.").

The Court of Appeals for the Second Circuit has frequently noted that the "essence of conspiracy is the agreement and not the

commission of the substantive offense." United States v. McDermott,

245 F.3d 133, 137 (2d Cir. 2001) (citation omitted). For a jury to

find a defendant guilty of a conspiracy charge, the Government need

not prove that the underlying substantive offense was actually

committed. See United States v. Rosengarten, 857 F.2d 76, 78 (2d

Cir. 1988) (Section 371 conspiracy to defraud "need not involve the

violation of a separate statute"). For the reasons explained above,

a rational jury could find that the defendants, including Stewart,

conspired to use deceitful and dishonest means to obstruct the

administration and enforcement of the SAMs. The fact that the

conspiracy did not in fact deceive the Government does not undermine

the existence of the conspiracy. Further, the fact that prison

visits were recorded by the Government does not undermine the

evidence that the defendants were in fact conspiring to use

deceitful and dishonest means. There is no evidence that Stewart

and Yousry were aware that their visits were being recorded. Their

actions were calculated to prevent the prison authorities from

discovering what Stewart and Yousry were doing during their visits.

In addition, Stewart argues that the Government did not offer

evidence sufficient to dispute Stewart's testimony that the purpose

of her actions was to provide zealous representation to Abdel

Rahman. (Stewart Mem. at 51.) This argument also fails. The jury

was entitled to disbelieve the defendant's testimony and use its

disbelief to supplement the other evidence against the defendant.

See Morrison, 153 F.3d at 50; Stanley, 928 F.2d at 577.  The jury

could disbelieve that zealous representation included filing false

affirmations, hiding from prison guards the delivery of messages to

Abdel Rahman, and the dissemination of responses by him that were

obtained through dishonesty.  Moreover, the Court specifically

charged the jury on good faith with respect to Count One, and a

rational jury could find, consistent with that charge and all of the

evidence, that the Government had proved bad faith.  (Tr. 12316-

12317.)

The defendants' motions for judgment of acquittal pursuant to

Rule 29 on Count One are therefore denied.

### III.

Stewart moves for a judgment of acquittal pursuant to Federal

Rule of Criminal Procedure 29, or an arrest of judgment under

Federal Rule of Criminal Procedure 34(a)(1), on Counts Six and Seven

of the S1 Indictment, which charged her with two separate violations

of 18 U.S.C. § 1001.  Rule 34(a)(1) authorizes the Court to arrest

judgment if the indictment does not charge an offense.  Stewart

argues that the Government failed to prove beyond a reasonable doubt

that Stewart knowingly and willfully made false statements, as

prohibited by Section 1001.  Stewart also repeats her argument,

previously rejected by the Court prior to trial, that a promise of

future performance can never be prosecuted as a false statement.

Counts Six and Seven charged Stewart with having made false
statements and having used a false writing and document when she
submitted affirmations to the United States Attorney's Office in May
2000 (Count Six) and May 2001 (Count Seven).  The specific
affirmation at issue in Count Six was the affirmation that Stewart
signed on May 16, 2000 and submitted to the United States Attorney's
Office on May 26, 2001.  (GX 7.)  The affirmation at issue in Count
Seven is the affirmation Stewart signed on May 7, 2001 and submitted
at that time.  (GX 12.)  In both affirmations, Stewart agreed to
abide by the terms of the SAMs applicable to Abdel Rahman, that she
"shall only be accompanied by translators for the purpose of
communicating with inmate Abdel Rahman concerning legal matters,"
and that she shall not "use [her] meetings, correspondence, or phone
calls with Abdel Rahman to pass messages between third parties
(including, but not limited to, the media) and Abdel Rahman."  The
May 2001 affirmation included the additional representation that
Stewart "will only allow the meetings to be used for legal
discussion between Abdel Rahman and [her]."  There was more than
sufficient evidence for a rational jury to find that Stewart
violated Section 1001 as charged in both Counts.

## A.

With respect to the May 2000 affirmation at issue in Count Six,
Stewart argues that there is no evidence that the statements in the

affirmation were false when made on May 16, 2000. The Government responds that the statements were actually "made" when Stewart submitted the affirmation to the United States Attorney's Office on May 26, 2000 – after the prison visit on May 19 and 20, 2000. The Government argues that there is more than sufficient evidence that at that time the representations in the affirmation were false because a rational jury could conclude that Stewart did not intend at that time to abide by the SAMs relating to Abdel Rahman, nor abide by her representation that she would not use her meetings with Abdel Rahman to pass his messages to third parties, including the media. Indeed, at that time, Stewart planned on issuing to the media Abdel Rahman's statement withdrawing his support for the cease-fire and had discussed her planned press conference with Abdel Rahman and Yousry during that visit. (See GX 1707X at 40; GX 1710X at 46-47.) Thus, the Government is correct that there was more than sufficient evidence from which a rational jury could conclude that Stewart made a knowingly false statement and used a writing or document containing a false statement, when, on May 26, 2000 she submitted her affirmation to the United States Attorney's Office.

In any event, there was also more than sufficient evidence from which a rational jury could have concluded that Stewart did not intend to comply with the SAMs or her affirmation when she initially signed her name to the document under penalties of perjury on May 16, 2000. Indeed, the jury found Stewart guilty of participating in

the Count One conspiracy to defraud the United States in the administration and enforcement of the SAMs for Abdel Rahman. That conspiracy began in June 1997, well before Stewart signed the SAMs affirmation on May 16, 2000.

Thus, evidence supporting Stewart's participation in the Count One conspiracy is relevant in considering her state of mind at the time she executed the SAMs affirmation on May 16, 2000. That evidence included instances in which, long before Stewart signed her affirmation on May 16, 2000, she had previously violated the SAMs by passing messages to Abdel Rahman from third parties during meetings. In March 1999, Stewart and Yousry visited Abdel Rahman at FMC Rochester and passed messages to him relating to the formation of a political party by the IG, and from Taha seeking Abdel Rahman's support for ending the cease-fire. (See GX 2415-6 and 2415-6T; GX 2059 and 2059T.) Also during that March 1999 meeting, Abdel Rahman passed messages back to Sattar and Taha through Yousry and Stewart. (See id.) From this evidence, the jury could reasonably infer that Stewart did not intend to abide by the SAMS when she signed the SAMs affirmation on May 16, 2000.

Stewart's conduct during the May 19-20, 2000 prison visit – coming only three days after executing the SAMs affirmation – also supports the rational conclusion that she did not intend to abide by the SAMs or the terms of the affirmation on May 16, 2000. There is no evidence to support an inference that Stewart's intent to comply

with the SAMs changed between her execution of the affirmation and
the visit. Instead, the reasonable inference is that Stewart's
conduct during the May 2000 prison visit is an accurate reflection
of her state of mind at the time she signed the affirmation on May
16, 2000. Indeed, particularly when viewed in the light of the
evidence of her prior conduct of March 1999 and her conduct during
the May 2000 visit, the reasonable inference is that when Stewart
signed her affirmation on May 16, 2000, she did not intend to abide
by the SAMs when she visited Abdel Rahman three days later.

### B.

Stewart also argues that the evidence was insufficient to
support her conviction on Count Seven regarding the May 2001
affirmation. Stewart argues that the Government offered no evidence
that she intended to violate the SAMs when she signed and submitted
the May 7, 2001 affirmation. However, a rational jury could
conclude beyond a reasonable doubt that, at the time Stewart signed
the affirmation on May 7, 2001, she did not intend to abide by the
SAMs or the terms of the affirmation.

The May 7, 2001 SAMs affirmation was executed in advance of the
July 13-14, 2001 prison visit. Stewart executed this new
affirmation following a period of many months during which she had
been cut off from Abdel Rahman by the United States because of her
release to the media of Abdel Rahman's withdrawal of support for the

cease-fire.  Thus, Stewart's past non-compliance with the SAMs and
her prior false affirmation that she would abide by the SAMs could
be used in assessing Stewart's state of mind when she submitted the
May 7, 2001 affirmation to the United States Attorney's Office.  The
fact that Stewart then violated the SAMs again in her next visit to
Abdel Rahman on July 13-14, 2001 supports the rational conclusion
that she did not intend to abide by the terms of her May 7, 2001
affirmation at the time it was made and submitted to the Government.
A rational jury could find beyond a reasonable doubt that the
affirmation contained false statements when made.

During the July 13-14, 2001 visit, Stewart once again allowed
messages to be passed from third parties to Abdel Rahman.  One such
message from Sattar included a message from Abdel Rahman's son,
Mohammed, asking Abdel Rahman to continue to oppose the IG cease-
fire.  (See GX 1716X at 62-63.)  Furthermore, during this visit,
Stewart actively engaged in covering noises – shaking a water bottle
and using the words "covering noises" to describe her conduct – as
Yousry reported to Abdel Rahman information he and Stewart had
obtained from Sattar: that the bombing of the U.S.S. Cole was
intended to coerce the United States to free Abdel Rahman from
prison, and that Sattar had been asked to approach the United States
Government to tell them that unless the United States released Abdel
Rahman, other attacks would follow.  (See 1717X at 11-13.)  Thus,
the evidence of Stewart's state of mind demonstrates that she

knowingly and willfully made false statements to the Government in
May 2001 when she represented that she would abide by the SAMs and
the terms of her affirmation.

## C.

Stewart also argues that broken promises of future intent
cannot be the basis for a violation of 18 U.S.C. § 1001.  She thus
argues that the evidence was insufficient to support the convictions
on Count Six and Seven and that those counts must be dismissed
pursuant to Fed. R. Cr. P. 34(a)(1) for failure to charge an
offense.

This Court previously rejected the identical argument and held
that "a knowingly false promise, which is a knowingly false
statement of present intent, can be a false statement within the
meaning of 18 U.S.C. § 1001."  Sattar I, 272 F. Supp. 2d at 377-78.
The Court specifically relied on the decision in United States v.
Shaw, 44 F.3d 285 (5th Cir. 1995), which the Court found to be
consistent with United States v. Uram, 148 F.2d 187 (2d Cir. 1945),
and United States v. Mandanici, 729 F.2d 914 (2d Cir. 1984).

Stewart argues that the decision in Shaw was wrong and should
not be followed.  But Stewart has presented no reason that the Court
should reconsider its prior decision.  For all of the reasons
previously explained, a knowingly false statement of present intent
can be a false statement within the meaning of 18 U.S.C. § 1001.

The jury was carefully instructed that, in order to find a violation of the statute, the Government was required to prove that the statements were untrue when made and that the defendant acted knowingly and willfully, and not simply that the defendant broke her promise recited in the affirmations. (Tr. 12363-64.)

The charges in Counts Six and Seven stated offenses. A rational jury could find that those charges were proved beyond a reasonable doubt. Therefore, the motions to enter judgment of acquittal or to arrest judgment on Counts Six and Seven are denied.

## IV.

Stewart moves for a judgment of acquittal on Counts Four and Five, and her motion could also be read to seek a new trial pursuant to Rule 33 on those Counts.

The elements of Count Five, the substantive offense of providing material support or resources to the Count Two conspiracy to kill, or concealing the nature, location, or source of such material support or resources in violation of 18 U.S.C. § 2339A, are: (1) that the Count Two conspiracy existed; (2) that within the United States, the defendant provided material support or resources, or concealed or disguised the nature, location, or source of material support or resources; and (3) that the defendant did so knowing or intending that it was to be used in preparation for, or in carrying out, the Count Two conspiracy. (See Tr. 12336-38.)

- 28 -

Count Two charged that Sattar, Abdel Rahman, Taha, and others conspired within the United States, from about September 1999 through about April 2002, to murder persons outside the United States in violation of 18 U.S.C. § 956.

The elements of Count Four, conspiracy to provide material support or resources or conceal the nature, location, or source of material support or resources in violation of 18 U.S.C. § 371, are: (1) that two or more persons entered into the unlawful agreement starting in or about September 1999; (2) that the defendant knowingly and willfully became a member of the conspiracy; (3) that one of the members of the conspiracy knowingly committed at least one of the overt acts or one which is substantially the same as one explicitly charged, in the Southern District of New York; and (4) that the overt act was committed to further some objective of the conspiracy. (See Tr. 12344-45.)

Consistent with its interpretation of 18 U.S.C. § 2339A explained in Sattar II, 314 F. Supp. 2d at 298, the Court instructed the jury that the "material support or resources" at issue here was "personnel" in the form of Abdel Rahman's participation, as a co-conspirator, in the Count Two conspiracy to kill. (See Tr. 12336-38 ("[T]he term 'personnel' refers to individuals jointly engaged in a common undertaking, namely, persons preparing for, or carrying out, the conspiracy to murder … persons outside the United States that is

charged in Count Two.")).  The Court further explained the concept of "personnel":

> Here, the government has the burden of proving beyond a reasonable doubt that the defendant you are considering provided material support or resources by making Abdel Rahman available as a co-conspirator – that is, as personnel – to the conspiracy charged in Count Two, or that the defendant you are considering concealed the nature, location, or source of Abdel Rahman as personnel for that conspiracy.

(Tr. 12337.)

Stewart contends that there was insufficient evidence of her knowledge of the Count Two conspiracy or her specific intent to provide material support in the form of "personnel" to that conspiracy.  She also argues that, at most, she disseminated the constitutionally protected speech of Sheikh Abdel Rahman, and that speech cannot constitute "personnel."

**A.**

As an initial matter, there was sufficient evidence from which a rational jury could have concluded that the Government had proved beyond a reasonable doubt the existence of the conspiracy charged in Count Two.  Stewart disputes her knowledge of the Count Two conspiracy and her knowledge and intent in providing material support and conspiring to do so, but has not attempted to develop any argument concerning the sufficiency of the proof of the existence of the conspiracy as charged in Count Two, and there was sufficient evidence of its existence.

- 30 -

For example, in September 1999, during a prison visit attended by Yousry, Abdel Rahman dictated points that a reasonable jury could have determined was a directive supporting Taha's militant position, and in particular, Abdel Rahman's permission to end the cease-fire. Sattar subsequently relayed that message to Taha which included statements that: "To those against whom war is made, permission is given to fight ...." (GX 1029X at 6.) Abdel Rahman explained the Initiative, subsequently referred to by Stewart as the cease-fire, as "the suspension of military operations." (Id.) After recounting the existence of the Initiative, Abdel Rahman recounted the alleged killing of four Islamic Group members, and concluded: "I therefore demand that my brothers, the sons of the Islamic Group do a comprehensive review of the Initiative and its results. I also demand that they consider themselves absolved from it." (GX 1029X at 6-7; see also GX 2204AT). While this message was conveyed by Sattar to Taha, it was not publicly disclosed because, as noted below, attorney Ramsey Clark refused to issue it publicly. Abdel Rahman's withdrawal of support for the cease-fire was later issued publicly by Stewart in June, 2000.

The evidence also showed that in the fall of 2000, Sattar and Taha wrote a fatwah, in Sheikh Abdel Rahman's name, "to mandate the killing the Jews wherever they are … and wherever they are found." (GX 1182X, at 15; see GX 1179X-1183X); caused the fatwah to be distributed worldwide (see GX 1182X); and agreed to tell Atia, a

militant leader of the IG, to "go by it." (GX 1188X at 5). The evidence was sufficient, as the jury found, to establish the existence of the Count Two conspiracy.

A rational jury could also find that Stewart provided the material support and resources to the Count Two conspiracy, and conspired with Yousry to do so, by making Abdel Rahman available to the Count Two conspiracy as a co-conspirator, and that she concealed the source of the material support, in particular by covering up the true nature of the conversations during the May 2000 prison visit. Prior to the May 2000 prison visit, the jury could reasonably have found that Sattar and Taha were unsuccessful in obtaining Abdel Rahman's public withdrawal from the cease-fire. In September 1999 Ramsey Clark refused to release the statement that Abdel Rahman had given to Yousry. (See GX 1030X at 1-3; GX 2312-40T). Similarly, in February 2000 attorney Abdeen Jabarra refused to take a message from Abdel Rahman to the IG out of prison. (See GX 1701X at 33-37; GX 1062X at 4.) As detailed above, the jury could have concluded that Stewart made Abdel Rahman available as a co-conspirator by bringing out of prison his withdrawal of support for the cease-fire, and by concealing from the prison authorities the fact that she was doing so.

Stewart brought Taha's and Sattar's message into the prison, and made covering noises while Yousry read the letter to Abdel Rahman, and Stewart and Yousry thereafter brought Abdel Rahman's

withdrawal from the cease-fire out of the prison.  Sattar then
conveyed that message to Hamza and Taha.  (GX 1093X, GX 1094X.)  On
June 13, 2000, Stewart relayed Abdel Rahman's withdrawal of support
for the cease-fire to Esmat Salaheddin to be distributed by Reuters.
(Tr. 5574-79.)  Thereafter, on June 21, 2000, after becoming aware
that pro-cease-fire advocates were denying that the prior statement
had come from Abdel Rahman, Stewart issued a reaffirmation of Abdel
Rahman's withdrawal of support for the cease-fire. (See GX 1111X at
4-22; GX 1114X at 2; GX 1250X at 1-4.)

Because Abdel Rahman was in prison and subject to very
restrictive conditions under the SAMs, he was unavailable to the
Count Two conspirators – particularly Sattar and Taha – without the
active participation of Stewart and Yousry.  A reasonable jury could
find that the actions of Stewart and Yousry made Abdel Rahman
available to provide leadership and direction as a conspirator in
the Count Two conspiracy, and that they thereby provided material
support, and conspired to provide and conceal material support, to
the Count Two conspiracy.

A reasonable jury could conclude that the evidence established
Stewart's knowledge of the Count Two conspiracy and her knowledge
and intent to make Abdel Rahman available as a co-conspirator,
thereby establishing the specific intent required by Section 2339A.
Sattar II, 314 F. Supp. 2d at 296.  The context of the letter from
Sattar and Taha that Stewart brought into the prison, together with

the context of the message that she brought out and publicly disseminated, support her knowledge that she was making Abdel Rahman available to the Count Two conspiracy.  On May 19, 2000, as described above, Stewart secretly brought into the prison a letter from Sattar that included a message from Taha.  Sattar's description of the message from Taha, who was referred to as Abu Yasir, stated that Taha had "massive weight among many brothers," and "that if the regime worried about anyone, it is [Taha]."  (GX 1707X at 35.)  Sattar's letter indicated that Taha and "many other Brothers" needed Abdel Rahman to have a more forceful position with respect to the cease-fire.  (GX 1707X at 36.)  Previously, during the same visit, Yousry had read to Abdel Rahman a statement by Taha who was described as "one of the Islamic Group leadership members in Egypt," a statement which the jury could have found supported revolution against the Egyptian regime. (GX 1706X at 54-55.)  The following day, as discussed above, Abdel Rahman dictated responses which included his position on the cease-fire and his support for Taha to be the head of IG, and if not, to at least have the person in charge consult with him.  (GX 1710X at 49; GX 1711X at 30-33.)  Stewart secretly brought this message out of prison, and it was delivered to Sattar and communicated to Taha and Hamza, and was the basis for the subsequent press release.

The jury could also have found that Stewart's knowledge and intent were supported by the fact that Stewart engaged in covering

noises and actions during the parts of the May 19-20, 2000 prison visit that related to Taha and the cease-fire. From this deliberate conduct, the jury could have concluded that Stewart was deliberately attempting to conceal from the prison authorities her actions in bringing in the statements and getting Abdel Rahman's response, and thus her provision of support for the Count Two conspiracy.

As described above, on June 13, 2000, Stewart issued Abdel Rahman's statement "withdrawing his support for the cease-fire that currently exists." The statement that Stewart released went on to state Abdel Rahman's opposition to the cease-fire:

> Sheikh Omar had concluded that the unilateral truce observed by the Islamic Group since the Luxor slaughter of 58 tourists and four Egyptians had brought no advantage to Egypt's biggest militant group.... There is absolutely nothing moving forward.... The people who launch the cease-fire have good faith but the [Egyptian] government has shown no good faith. He wants people not to place hope in this process because nothing is moving forward.

(GX 524, Tr. 5573-74.) The plain meaning of a "cease-fire" is a suspension of active hostilities - a truce. A rational jury could conclude, particularly with the full context of the press release by Stewart and the circumstances under which Stewart obtained the statement, that Stewart knew that this statement was support for those within the IG who sought to end the cease-fire and to resume the killings that had occurred before. Indeed, the statement itself placed the cease-fire in the context of a unilateral truce observed by the IG after the killings at Luxor. Furthermore, Stewart knew

that the statement was obtained as a direct result of the request by Taha, a pro-violence leader of the IG, relayed by Sattar.[1]

A rational jury could have found that Stewart was aware of the significance of conveying Abdel Rahman's withdrawal of support for the cease-fire because, based on trial evidence from the trial of Abdel Rahman of which she was aware and which was introduced at this trial, she was aware of Abdel Rahman's role and influential position within the IG (see, e.g., GX 208 T at 2), the fact that he was consulted about acts of violence (see, e.g., GX 209T), and that he preached violence (see, e.g., GX 220T-04T, 211T.)[2] A rational jury could have inferred that, by relaying a statement withdrawing

---

[1] In her Memorandum, Stewart claims that there was no evidence that she knew or had any contact or connection with Taha. Stewart Mem. at 38. However, Stewart brought a letter into the prison containing a statement explicitly attributed to Taha, "one of the Islamic Group leadership members in Egypt," that the jury could have found supported revolution in Egypt. (GX 1706X at 55.) The statement calling for a more forceful position on the cease-fire was attributed to Abu Yasir, rather than Taha, but the letter itself indicates his position in the IG – that he had massive weight among many Brothers and the Egyptian regime worried about him. (GX 1707X at 35.) Abu Yasir was another name for Taha, and the jury could reasonably find that Stewart knew these were the same person. Stewart had the translation of a newspaper article in her office that discussed "Refai Taha (Abu Yasser), member of the 'Islamic Group' Shura Council." (GX 2671.) After the issuance of the first press release, and before the issuance of the second press release, one of the articles marked as approved by Stewart contained statements attributed to Taha, and the article noted: "The Egyptian authorities regard Taha, alias Abu Yasir, as the Group's military official." (GX 2312-45BT.)

[2] Stewart also testified at length in the course of her case regarding her knowledge of Abdel Rahman, admitting that she knew that Abdel Rahman advocated violence (see Tr. 7471), was a prominent and high-ranking leader in a fundamentalist movement as early as the 1970s (see Tr. 7472), was a person to whom his followers wrote to get his interpretation of Islamic law (see Tr. 7721), and was a person of great influence within IG even after being sentenced and cut off from contact with the IG (see Tr. 8129-30). Stewart also testified that, at the time she issued the June 2000 press release, she knew that the IG had engaged in acts of violence against tourists in the past as a means of attacking Egypt's government and economy. (See Tr. 8349-50.) Finally, Stewart understood that the Luxor massacre was carried out in Abdel Rahman's name, and that leaflets were left on the scene saying the massacre was inspired by Abdel Rahman in an effort to secure his release. (See Tr. 8359.)

support for a cessation of violence by an influential, pro-violence leader of a terrorist group, Stewart knew that she was providing support to those within the IG who sought to return to violence - who the jury could have found were participants in the Count Two conspiracy, particularly Taha.

Stewart's knowledge and intent is also supported by her actions in issuing a reaffirmation of Abdel Rahman's withdrawal of support for the cease-fire on June 21, 2000. (GX 2663.) As explained above, she did so only after becoming aware of a conflict between the pro-cease-fire factions and the pro-violence factions, and indeed after there were allegations that the statement did not come from Abdel Rahman. Moreover, Stewart was aware from press reports that the first press release was being used by the pro-violence faction within the IG, particularly those led by Taha, to support its position. While the press reports were not admitted for the truth of the contents of the articles, they did put Stewart on notice of what the consequences were for a reaffirmation of Abdel Rahman's withdrawal of his support for the cease-fire.

More particularly, at the time of the issuance of the reaffirmation, Stewart had reason to believe that: (1) based on Stewart's first announcement of Abdel Rahman's withdrawal of support for the cease-fire, Taha stated that IG "leaders might end the unilateral truce they announced two years ago to stop operations" (GX 2312-45BT); (2) Abdel Rahman's withdrawal of support for the

cease-fire was viewed as supportive of the pro-violence faction of
IG and as "favorable to Taha," who was described as a "[prominent]
leader" of the "hard-line faction within IG that rejects the cease-
fire" (GX 2312-49T); (3) Taha said that the withdrawal of support
for the cease-fire by Abdel Rahman, IG's "spiritual leader," could
cause IG to "end" "the truce that it had announced unilaterally two
years ago" (GX 2312-45AT); and (4) the pro-cease-fire faction in IG
reacted vehemently to the withdrawal of support for the cease-fire
(see GX 2312-47AT, 2312-50T, 2312-55T, 2312-57T).[3]

Indeed, after issuing the reaffirmation despite knowing all
this, Stewart told Abdel Rahman that she was "very pleased and that
she would like to do more ...." (GX 1731T at 33.) Thus, the fact
that Stewart again disseminated worldwide Abdel Rahman's withdrawal
of support for the cease-fire, even after learning of the turmoil
within IG that her first announcement caused, and the support that
it gave to the pro-violence faction of IG, would also support a
rational jury's conclusion that Stewart acted with the requisite
knowledge and intent.

Stewart emphasizes in her motion that Abdel Rahman's statements
did not cancel the cease-fire, but only withdrew his support for it.
But the jury could have found that the statements provided

---

[3] Each of these newspaper articles – GX 2312-45AT, 2312-45BT, 2312-47AT, 2312-49T,
2312-50T, 2312-55T, 2312-57T – were marked as having been approved for reading to
Abdel Rahman by Stewart, from which the jury could conclude that Stewart was
familiar with their contents. Indeed, Stewart testified that Yousry told her
about the reactions to her first press release as reported in the media and she
reviewed newspaper articles. (See Tr. 7817-18.)

leadership to the pro-violence faction of the IG – including Sattar and Taha, members of the Count Two conspiracy - that had sought to enlist Abdel Rahman's support in ending the cease-fire since at least September 1999.

A rational jury could also have found that Stewart intended that the material support she provided and concealed would be used to carry out and prepare for the conspiracy to kill based on Stewart's own statements and motivations, viewed in combination with her actions, as described above, in twice issuing Abdel Rahman's withdrawal of support for the cease-fire.  During the May 2000 prison visit, after being told by Yousry that the Abu Sayyaf terrorist group in the Philippines took hostages and demanded Abdel Rahman's freedom in exchange for the release of hostages, Stewart said "Good for them ...."  (See GX 1706X at 27.)  Stewart went on to explain, "I think things like that in the Philippines, even though it may be futile and not be successful, they still keep your name … as someone that eh, the Mujahideen eh, consider their own hero.  It is very, very crucial."  (1706X at 32.)

Similarly, in a recorded call on October 2000, after being told that a fatwah to kill Jewish people was issued and attributed to Abdel Rahman - which was an overt act charged in the Count Two conspiracy - Stewart reacted ultimately by stating that it was her position that "yes, he's going to get his message out no matter what."  (GX 1193X at 13.)  Yousry told Stewart that Abdel Rahman did

not want his lawyers to disavow the _fatwah_, and Stewart also stated

that the _fatwah_ should not be disavowed by Abdel Rahman's lawyers.

(See GX 1193X at 3, 12.)  A rational jury could use this evidence to

find a motivation for Stewart's actions as charged in Counts Four

and Five of the S1 Indictment.[4]

Stewart also argues that the evidence of her specific intent

was insufficient because the Government did not prove the specific

identity of the victims of the conspiracy to kill in violation of 18

U.S.C. § 956 or in which country or countries the victims would be

killed.  Stewart's argument is incorrect.  This Court has previously

held that the Government was not required to allege or prove the

identity of contemplated victims or the specific location outside

the United States where the contemplated killing is to occur for

purposes of the Section 956 conspiracy.  See Sattar II, 314 F. Supp.

2d at 303-05.  Similarly, it is not necessary for the Government to

prove that a defendant who knowingly provides or conspires to

provide material support to such a conspiracy must know the identity

of the victims of the conspiracy or their location.  Cf. United

---

[4] Stewart relies on numerous cases that stand for the proposition that "absent
evidence of purposeful behavior, mere presence at the scene of a crime, even when
coupled with knowledge that a crime is being committed, is insufficient to
establish membership in a conspiracy; and mere association with conspirators is
similarly insufficient."  United States v. Martino, 759 F.2d 998, 1002 (2d Cir.
1985).  See Stewart Mem. at 38, 42-49; Stewart Reply Mem. at n.27.  In this case,
however, Stewart did engage in knowing, purposeful activity.  With knowledge of
the contents of the letter she was to bring into the prison, she secretly brought
it in, made covering noises while it was read, secretly brought out a response and
released a statement directly to Esmat Salaheddin containing Abdel Rahman's
withdrawal of support for the cease-fire.  The jury could rationally have found
the requisite purposeful activity.

States v. Salameh, 152 F.3d 88, 154 n.16 (2d Cir. 1998) (noting that
to prove a bombing conspiracy under a statute referring to crimes
against "any" building, vehicle or property, the Government was not
required to prove that defendant "agreed to bomb a 'populated
structure in an urban area,'" because "[n]one of the four criminal
objectives charged in the indictment required the government to
prove that the defendant was aware of the specific target of the
bombing"); United States v. Romero, 897 F.2d 47, 50-51 (2d Cir.
1990) (affirming conviction for conspiring to kill federal officer
where defendants conspired to kill "anyone posing a threat to them
or [their narcotics] business").

Stewart incorporates by reference arguments made by her counsel
at the conclusion of the Government's case to the effect that Count
Two was defective because the contemplated killings could occur in
Jerusalem or Palestine, and neither of these places may be a
"foreign country." (Tr. at 7136.) This argument is not a basis for
a judgment of acquittal or new trial. The actual text of Section
956(a) requires only a conspiracy to commit murder "outside the
United States," not "in a foreign country." All of the various
possibilities suggested by Stewart's counsel as well as by the
evidence in the case were outside the United States.

**B.**

Stewart argues that the evidence was insufficient to prove that she provided "material support" to the Count Two conspiracy because the only "material support" the Government relied upon was Abdel Rahman's protected speech that cannot serve as the basis for a prosecution under Section 2339A. Stewart argues that "it is not 'personnel,' in the form of Sheikh Omar Abdel Rahman ... that Ms. Stewart 'made available' to [the Count Two conspiracy]; rather it is Sheikh Rahman's words – his speech – that Ms. Stewart allegedly 'made available' to the alleged conspiracy." (Stewart Mem. at 5 (emphasis in original)).

This argument has already largely been rejected in this Court's prior opinion denying the motion to dismiss Counts Four and Five in the S1 Indictment, and by the jury verdict which determined guilt based on the definition of personnel and the scienter standard explained in this Court's prior opinion. See Sattar II, 314 F. Supp. 2d at 296-303.

In the prior opinion, this Court rejected the argument that Section 2339A could not be applied to the alleged provision of Abdel Rahman as a co-conspirator in the conspiracy to kill, and that the statute was unconstitutional as applied to such allegations. The substance of the allegations in the S1 Indictment were those proved at trial - that Stewart relayed information and messages to and from Abdel Rahman, that she covered up the conversations with Abdel Rahman, and that she issued Abdel Rahman's withdrawal of support for

the cease-fire.  The Court found that the provision of Abdel Rahman in this way, even though it was by conveying his words, was consistent with the meaning of Section 2339A: "[T]here is no basis to limit the meaning of 'provides . . . personnel' to the physical transfer of personnel, and not to include making personnel available – which is in accord with the ordinary and natural use of the term 'provide,' and which is consistent with its placement in the statute and the purpose of proscribing the provision of resources used for a prohibited purpose."  Sattar II, 314 F. Supp. 2d at 297.

Thus, the Court previously rejected the argument that Stewart could not be convicted for making Abdel Rahman available through his words, as opposed to physically in person, to participate in the Count Two conspiracy as a co-conspirator.  Id. at 298.  A reasonable jury could find that Abdel Rahman was a participant in the Court Two conspiracy to kill, and that the methods of his participation occurred by his words, statements, directives, and leadership. Abdel Rahman's participation in the conspiracy was not merely a one-way flow of statements; Stewart brought information and requests from Sattar and Taha to Abdel Rahman, allowing the imprisoned leader of the IG to continue to direct his followers.  Notably, Stewart knew from her March 1999 visit that Abdel Rahman instructed his followers from prison that "[n]o new charter, and nothing should happen or be done without consulting me, or informing me."  (GX

1007X at 5.)  As noted above, a reasonable jury could have found

that Abdel Rahman provided the leadership sought by Sattar and Taha.

When the Court previously rejected Stewart's challenge to the

"provision" of Abdel Rahman as "personnel," the Court explicitly

noted that the constitutional concerns raised by the use of the term

"personnel" in 18 U.S.C. § 2339B were not present in this case.  See

id. at 296.  Section 2339B makes it unlawful to knowingly provide

material support or resources to a designated foreign terrorist

organization.  "Material support or resources" is defined in 18

U.S.C. § 2339A(b)(1) - which also applies to Section 2339A - and

includes "personnel."  This Court had previously found that the

"provision" of "personnel" was unconstitutionally vague as applied

to the allegations in the original indictment, which charged that

Stewart had violated 18 U.S.C. § 2339B by providing personnel

including herself to a designated foreign terrorist organization.

Sattar I, 272 F. Supp. 2d at 358-60.  See also Boim v. Quranic

Literacy Inst. and Holy Land Fnd. for Relief and Dev., 291 F.3d

1000, 1021-24 (7th Cir. 2000); Humanitarian Law Project v. Reno, 205

F.3d 1130, 1137 (9th Cir. 2000).  Stewart relies on those cases

pertaining to Section 2339B here in her current motion.[5]  Stewart

---

[5] Stewart also relies on United States v. Khan, 309 F. Supp. 2d 789 (E.D. Va.
2004) to argue that the provision of Abdel Rahman could not be considered to be
the provision of "personnel" as for purposes of Section 2339A.  In Khan, the Court
found various defendants guilty of violating Section 2339A for providing
"personnel" knowing or intending that they are to be used in preparation for, or
in carrying out, a violation of 18 U.S.C. § 956.  The Court in Khan rejected the
argument that the use of "personnel" in Section 2339A as applied to the facts of

Mem. at 14-17.  But this Court previously rejected those concerns as applied to the allegations of the provision by Stewart of Abdel Rahman as a co-conspirator in the Count Two conspiracy in violation of Section 2339A.  As this Court explained:

> The First Amendment concerns raised by the use of "personnel" in § 2339B, as applied to persons who provided themselves as "personnel" to an organization, are simply not present in this case.  Section 2339A is being applied to persons who allegedly provided other personnel "knowing and intending that [it is] to be used in preparation for, or in carrying out" a violation of specific statutes, in this case a conspiracy to kill or kidnap persons in a foreign country.  The allegations in this case do not concern the scope of membership in an organization or the permissible extent of advocacy.

Sattar II, 314 F. Supp. 2d at 301.  There is no basis to reconsider the Court's prior ruling.[6]

Additionally, the jury found that Stewart knowingly or intentionally made Abdel Rahman available to participate in the Court Two conspiracy as a co-conspirator, as opposed to merely making Abdel Rahman's speech available.  The jury was instructed that the "personnel" that Stewart allegedly provided and concealed,

_____

that case violated the First Amendment, and found that the statute did not implicate First Amendment concerns at all.  Id. at 822.  The Court noted that the alleged conspiracy "was not to provide 'personnel' who would speak on behalf of [the organization], or provide moral support, or simply receive training, but to provide personnel who, after receiving training, would serve that organization as soldiers, recruiters, and procurers of supplies." Id.  In this case, Abdel Rahman was sought as a co-conspirator to do more than speak on behalf of the organization.  A reasonable jury could have found that Stewart provided and conspired to provide Abdel Rahman's to the Count Two conspiracy for his leadership as a co-conspirator.
[6] Stewart also renews, in the alternative, her overbreadth challenge to Section 2339A.  Stewart Mem. at 32 n.21.  This argument was also previously rejected in the same opinion, and there is no basis to reconsider the decision.  Sattar II, 314 F. Supp. 2d at 304-05.

and conspired to provide and conceal, consisted of Abdel Rahman being made available as a co-conspirator.  (See Tr. 12336-38.)  The jury also found that Stewart acted with the requisite "high scienter" that the Court relied upon in its previous decision as curative of any alleged vagueness problems with Stewart's prosecution for this conduct.  (See Tr. 12337-38 (jury instruction on knowledge or intent element).)  Thus, the jury's verdicts on Counts Four and Five represent a finding that Stewart made Abdel Rahman available as a co-conspirator in the Count Two conspiracy by conveying his statements from prison.

The fact that Abdel Rahman participated in the conspiracy by his words does not make his participation constitutionally protected.  The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech.  As Chief Judge Mukasey explained, "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself....  The gist of the crime of conspiracy is agreement to violate the law....  Thus, it is both possible and permissible to charge that criminal statutes were violated entirely by means of speech."  United States v. Rahman, S3 93 Cr. 181, 1994 WL 388927, at *1-2 (S.D.N.Y. July 22, 1994) (internal citation omitted).  Further, as the Court of Appeals explained in affirming Abdel Rahman's conspiracy conviction:

> Numerous crimes under the federal criminal code are, or can be, committed by speech alone.... Various [statutes] criminalize conspiracies of specified objectives .... All of these offenses are characteristically committed through speech. Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching. Of course, courts must be vigilant to insure that prosecutions are not improperly based on the mere expression of unpopular ideas. But if the evidence shows that the speeches crossed the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, the prosecution is permissible.

United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999). See also United States v. Rowlee II, 899 F.2d 1275, 1278 (2d Cir. 1990) ("It rarely has been suggested that the constitutional freedom for speech ... extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.") (internal citation and quotation marks omitted).

Stewart argues that the words of Abdel Rahman that she conveyed did not contain any directive or leadership or provide any function to the conspiracy, but merely expressed Abdel Rahman's "opinion" regarding the cease-fire. This argument is without merit. As noted above, the evidence would support a reasonable jury's finding that Abdel Rahman provided leadership supporting Taha's militant position, and that his statements withdrawing support for the cease-fire were in furtherance of the conspiracy to kill. Furthermore, the jury could have also found that Abdel Rahman's words provided

direction and leadership in other ways, including urging that Taha
be given his "natural right as the head of the group."  (GX 1710X at
53.)  Much like in Abdel Rahman's original conviction, the evidence
showed that his words "were not simply the expression of ideas" but
instead "they constituted the crime of conspiracy."  Rahman, 189
F.3d at 117.

Moreover, even if Abdel Rahman's words were protected speech,
it is not his words but his agreement that is criminalized in the
Count Two conspiracy.  In United States ex rel. Epton v. Nenna, 446
F.2d 363 (2d Cir. 1971), the Court of Appeals rejected the argument
that the defendant's "conviction for conspiracy to riot violated his
rights under the first amendment because the overt acts alleged in
the indictment were all constitutionally protected speech."  Id. at
366.  The Court of Appeals disagreed with the premise of the
defendant's argument and concluded that, in fact, some of the overt
acts were actually unprotected.  Id. at 367.  Additionally, however,
the Court reasoned that, when a defendant is convicted of conspiracy
to commit an unlawful act, "it is not the 'speech' that is made
criminal, but rather the agreement, and whether the overt act is
constitutionally protected speech would be irrelevant."  Id. at 368.

Under Epton, it is plain that there is no constitutional defect
in the fact that Abdel Rahman's participation in the Count Two
conspiracy was, in part, through his words provided by Stewart.  The
jury could reasonably have found his agreement and support for the

Count Two conspiracy, and that the words conveyed by Stewart furthered that conspiracy.  While the Government points out that under Epton, all overt acts in furtherance of a conspiracy can be constitutionally protected acts, it is not necessary to reach that issue here.  There were numerous acts in furtherance of the Count Two conspiracy that were not the words of Abdel Rahman.

Stewart also relies on Brandenburg v. Ohio, 395 U.S. 444 (1969) (per curiam), and its progeny for the proposition that Abdel Rahman's words were protected by First Amendment.[7]  Brandenburg reversed a conviction under the Ohio Criminal Syndicalism Act, which purported to punish mere advocacy because "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  Id. at 447.  Brandenburg and its progeny are not applicable here, where Abdel Rahman was found to have participated in the Count Two conspiracy to murder, rather than having merely engaged in advocacy.  Brandenburg analysis does not apply to unlawful speech-acts such as conspiracy or aiding and abetting.

---

[7] The Government argues incorrectly that Brandenburg and its progeny cannot apply because those cases involved content-based statutes directed at advocacy, as opposed to generally applicable, content-neutral statutes aimed at conduct, such as Section 2339A.  See Govt. Mem. at 63.  However, Brandenburg's progeny have applied its standard to content-neutral statutes.  See, e.g., Hess v. Indiana, 414 U.S. 105 (1973) (per curiam) (applying Brandenburg standard to a content-neutral disorderly conduct statute used to punish mere spoken words).

United States v. Bell, 414 F.3d 474, 482 n.8 (3d Cir. 2005).

Moreover, even if Abdel Rahman's speech were constitutionally protected under the Brandenburg standard, this would not help Stewart because, as explained above, overt acts in furtherance of a conspiracy can be constitutionally protected speech. Epton, 446 F.2d at 368.

The jury was also carefully instructed in this case on the limited use it could make of statements that could be construed as advocacy of violence. See Tr. at 12319-12321. The instruction was based on the instruction Chief Judge Mukasey gave in the Rahman case, which was noted with approval by the Second Circuit Court of Appeals. Rahman, 189 F.3d at 118.

Thus, there is no constitutional impediment to finding that Abdel Rahman participated in the Count Two conspiracy through his words and that Stewart provided him, and conspired to provide him, as a conspirator in the Count Two conspiracy. The motion for judgment of acquittal or new trial on Counts Four and Five is denied.

## V.

Stewart argues that the SAMs and the charges resulting from them are unconstitutional as applied. See Stewart Mem. at 63-66. The Court has previously rejected these arguments, and there is no basis to revisit those rulings. See Sattar II, 314 F. Supp. 2d at 308-310; Sattar I, 272 F. Supp. 2d at 299-303.

## VI.

Stewart renews her argument that she has been selectively prosecuted, arguing in particular that she has been prosecuted while Ramsey Clark was not. Relying on United States v. Fares, 978 F.2d 52, 59 (2d Cir. 1992), the Court has previously denied a nearly identical motion. See Order dated September 1, 2004. There is no basis to reconsider that ruling. Given the seriousness and extent of the criminal acts found by the jury against Stewart compared with the evidence relating to Clark, Stewart has failed to make a prima facie showing that she is similarly situated to Clark and that she has been singled out for prosecution. She has also failed to make any showing that she has been singled out because of bad faith or because of her political views. Stewart has also failed to make the showing necessary for discovery or an evidentiary hearing. See also Sattar II, 314 F. Supp. 2d at 311-14 (denying vindictive prosecution claim); Order dated September 1, 2004 (denying selective prosecution claim).

## VII.

Stewart moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the grounds that she was prejudiced by the admission of unfairly prejudicial evidence, which she argues was mainly not admissible against her but only against her co-defendants. She argues that the Court should have granted

her previous severance motions pursuant to Rule 14 of the Federal Rules of Criminal Procedure, based on prejudicial spillover.

The Court previously set out the standards for severance under Rule 14 of the Federal Rules of Criminal Procedure and denied such motions both before and during trial.  See Sattar II, 314 F. Supp. 2d at 317; Sattar I, 272 F. Supp. 2d at 380-81.  There is no basis to reconsider those rulings and grant a new trial.  As the Court has previously explained, much of the evidence about which Stewart complains, and which she claims should have justified a severance, would have been admissible at a trial of Stewart alone because it supported the existence of the Count Two conspiracy, which the Government was required to prove as an element of the charges against Stewart in Counts Four and Five.  To the extent Stewart is complaining about the admission of evidence that she claims was unfairly prejudicial, the Court made the careful balancing analysis throughout the trial under Federal Rule of Evidence 403, excluding evidence where the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

Moreover, the Court gave careful limiting instructions with respect to the consideration of evidence, limiting the jury's consideration of evidence where appropriate to specific defendants or for specific purposes.  Despite the number of limiting instructions in this case, Stewart does not point to the inaccuracy of any such limiting instruction.  Jurors are presumed to follow

such instructions, and there is no basis to believe that they did not do so here.  See Richardson v. Marsh, 481 U.S. 200, 206 (1987); Salameh, 152 F.3d at 116-17.

In addition, to the limiting instructions that were given when exhibits were introduced, repeated reference was made throughout the trial to such limiting instructions, including during the Government's cross-examination of certain witnesses.  (See, e.g., Tr. at 9732-34, 10506-514.)  Furthermore, before any exhibit was sent to the jury during deliberations, the Court included any limiting instructions relating to the exhibit in the note sent to the jury with the exhibit.  Finally, the Court gave careful instructions to the jury in its final charge, including instructions that the jury was required to follow any limiting instructions (Tr. 12276), that the jury was required to make a separate determination of each defendant's guilt (Tr. 12280), and that the verdict as to any defendant on any count should not control the decision as to any other defendant or any other count.  (Tr. 12300-01.)

## CONCLUSION

This opinion has not attempted to summarize all of the evidence at the trial, but has concentrated on the specific issues raised in the motions.    There was sufficient evidence at the conclusion of the Government's case, and again at the conclusion of all of the evidence, for a reasonable jury to find each of the defendants guilty beyond a reasonable doubt on each of the counts in which each was charged.    Thus, the Rule 29 motions are denied.

The Court has considered all of the arguments.    To the extent not specifically addressed herein, the arguments are either moot or without merit.

For the reasons stated above, all of the pending motions are **denied.**

**SO ORDERED.**

**Dated:    New York, New York**
         **October 24, 2005**

John G. Koeltl
United States District Judge

- 54 -