**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**UNITED STATES OF AMERICA**

       - against –

**AHMED ABDEL SATTAR,**
    **a/k/a "Abu Omar,"**
    **a/k/a "Dr. Ahmed,"**
**LYNNE STEWART, and**
**MOHAMMED YOUSRY,**

               Defendants.
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**S1 02 Cr. 395 (JGK)**

<u>OPINION & ORDER</u>

**JOHN G. KOELTL, District Judge:**


    Defendant Lynne Stewart moves for a new trial pursuant to Fed. R. Cr. P. 33, or in the alternative, an evidentiary hearing based on alleged juror misconduct by Juror #82 during the <u>voir</u> <u>dire</u> examination. Defendant Stewart also requests that the Court conduct an inquiry into allegations of extraneous influence on Juror #39 and complaints by Juror #39 about the deliberation process. Co-defendants Ahmed Abdel Sattar and Mohammed Yousry join in these applications. For the following reasons, these applications are denied.

### I.

    The relevant facts relating to the defendants' applications are as follows. On February 10, 2005, after an eight-month jury trial, defendants Stewart, Sattar, and Yousry were convicted of all charges contained in the seven-count Superseding Indictment. (Tr. 13116-19.) Specifically, the jury convicted Sattar of solicitation of

crimes of violence and conspiracy to kill persons in a foreign
country in violation of 18 U.S.C. §§ 373 and 956.  Stewart and
Yousry were convicted of providing and concealing, and conspiracy to
provide and conceal, material support and resources to terrorist
activity in violation of 18 U.S.C. §§ 2339A and 371.  Stewart was
also convicted of two counts of false statements in violation of 18
U.S.C. § 1001, and all defendants were convicted of conspiracy to
defraud the United States in violation of 18 U.S.C. 371.  Among the
twelve jurors rendering the verdict were Jurors #82 and #39.

## A.

On June 3, 2005, nearly four months after the jury returned the
verdict, defendant Stewart moved for a new trial pursuant to Fed. R.
Crim. P. 33, or alternatively for an evidentiary hearing, because
Juror #82 allegedly provided material false information during the
voir dire process, denying Stewart her Sixth Amendment right to an
impartial jury.  (Stewart Mot. 1.)  Co-defendants Sattar and Yousry
join in this motion. (Stewart Reply Mem. at 1 n.2.)

As evidence of Juror #82's misconduct, Stewart offers the May
24, 2005 sworn declaration of Juror #76, a prospective juror not
selected for the trial in this action.  (5/24/2005 Decl. of
Prospective Juror #76 at ¶ 1.)  Prospective Juror #76 recalls that
while awaiting jury selection a year earlier on May 20, 2004, she
and the other prospective jurors rearranged their chairs to talk to

-

each other, and she overheard Juror #82 talk "about many things, but mainly about sports."  (Id. at ¶3-4.)  Prospective Juror #76 states that "[a]t some point in the afternoon, [Juror #82] told us that he had been in jail for a couple of nights when he was in the military and that he did not want to go back there.  He then said, in substance, that if someone is in front of a judge on charges, it is because they had done something wrong."  (Id.)  Prospective Juror #76 watched the Court swear in Juror #82 as a member of the jury, but did not inform the Court of what she had heard.  (Id. at ¶5.)  Prospective Juror #76 first provided this information by contacting defense counsel after the trial.  (Id. at 1 n.1; Stewart Reply Mem. at 4 n.3.)

Due to the extensive publicity surrounding this case, a two-part voir dire process was used before trial.  Prior to jury selection in May 2004, approximately 500 prospective jurors, including Juror #82, filled out a lengthy 45-page juror questionnaire.  (6/02/2005 Dratel Decl. in Support of Post Trial Motion, Ex. 2 ("Juror #82 Questionnaire").)  The Government, defendants, and the Court reviewed the completed questionnaires to strike jurors for cause and identify any issues that needed to be explored through questioning of individual jurors.  The remaining prospective jurors were individually interviewed by the Court in open court.  All the prospective jurors were identified only by

numbers and the anonymity of the jurors was preserved throughout the trial and continues to be preserved.

On his questionnaire, Juror #82 had provided sworn answers that he would accept the presumption of innocence (Question #108), require the prosecution to bear the burden of proof beyond a reasonable doubt (Question #109), base his verdict solely on the evidence or lack of evidence presented in court (Question #110), and was otherwise able to serve as a fair and impartial juror (Questions 113-115). (Juror #82 Questionnaire at 40-41.) In response to Question 45(f), Juror #82 indicated that he had not been in prison, although he disclosed that his brother had been in prison for a drug conviction. (Id. at 18.) Juror #82 acknowledged in response to Question 47 that his brother "committed a crime and he did the time," and indicated there was nothing about his brother's conviction and imprisonment that would prevent him from being a fair and impartial juror. (Id.) In response to Question 27, which specifically inquired into any military disciplinary actions, Juror #82 disclosed that he had been subject to an Article 15 disciplinary action. (Id. at 13.) During the course of follow up voir dire questioning by the Court, Juror #82 disclosed that he received an Article 15 and lost a stripe for disobeying an order to march, and that his brother had been imprisoned for three years; Juror #82 testified that nothing about this would prevent him from being a fair and impartial juror in this case. (Tr. 397-99.) Defendants

allege that these responses were misrepresentations that concealed bias against the defendants.

**B.**

On June 3, 2005, counsel for Stewart wrote the Court requesting that it "follow-up" and inquire into allegations made by Juror #39. (6/03/05 Shellow-Lavine Ltr. at 1.) The letter indicated that co-defendants Sattar and Yousry joined in the request. Id.

In March 2005, following the verdict, one attorney for Stewart was contacted by "three persons (not affiliated with the lawyers in this case) alerting [him] that a juror wanted to speak to [him]." (6/02/2005 Dratel Decl. at ¶2.) One of these persons was Steven J. Masef, Esq., who was acting as informal counsel for Juror #39. (Id.) Starting on March 3, 2005, counsel for Stewart held several phone calls with Mr. Masef, culminating in an April 26, 2005 meeting among three defense counsel, an additional lawyer they had brought with them, Mr. Masef, and Juror #39. (Id. at ¶3-5.)

Through the phone calls with Mr. Masef, Stewart's defense counsel was allegedly told that Juror #39 "had been one of the two 'holdouts' on the jury" and that "a person not on the jury had said to her at some point, in sum and substance, 'So you're the holdout? If you let the terrorist go, you're a terrorist yourself.'" (Id. at ¶4.) At one point, Mr. Masef indicated to Stewart's counsel that this person "was a court officer or court personnel." (Id.)

However, at the April 26 meeting, Juror #39 allegedly told defense counsel that "on the last day of deliberations, as she was getting out of the van in which she had been transported to the courthouse, someone from outside--by which she meant someone not on the jury-- identified her and said 'that's the holdout.'" (6/03/05 Shellow-Lavine Ltr. at 2.)  Juror #39 also reported that another juror had told her earlier in deliberation "that it would be her fault if anyone died as a result of this trial."  (Id.)  Juror #39 added that "maybe she wasn't thinking clearly when she voted to convict the defendants." (Id.)

Earlier, on February 23, 2005, Juror #39 had contacted the Jury Administrator and said she wanted to write a letter to the Court about something that happened in the jury room.  The Court brought that contact to the attention of the parties.  On March 25, 2005, after phone conversations between Mr. Masef and defense counsel, of which the Court was not informed, Juror #39 sent a letter to the Court, which was filed under seal attached to an Order from this Court dated April 1, 2005.  The typewritten letter was plainly written with the assistance of somebody other than Juror #39.  On its face, the March 25 letter describes the course of internal juror deliberations, and does not refer to any of the alleged outside comments discussed above.  The letter states that Juror #39's verdict "came about only as a result of the fear and intimidation [she] was made to feel for [her] life during the course of

-

deliberations." (3/25/05 Juror #39 Ltr. at 1.)  The letter complains

of "a relentless verbal assult [sic] on my person and my position

until I had no other choice but to relent because of fear I felt."

(Id.)

The alleged "hold out" comment from someone outside of the jury

would have occurred during a period of heightened jury security

following a January 25, 2005 incident in one of the vans

transporting the jurors home.  (Tr. 12624.)  After the incident, the

Court conducted in the presence of representative counsel of the

parties an individual voir dire of each the jurors in the van (which

did not include Juror #39) to ensure that nothing about the incident

would affect the juror's decision.  (Tr. 12624-94.)  In addition,

the Court assigned a marshal to accompany the jurors in the vans to

ensure that no inappropriate conduct occurred.  (Tr. 12888.)

On February 9, 2005, the day before the verdict, Juror #39

indicated through a note from the jury foreman that she would like

to speak to the Court.  (Court Ex. 148.)  The Court met with Juror

#39 on February 9, 2005, in the presence of representative counsel

for the defense and the Government.  (Tr. 13054-56.)  During this

meeting, Juror #39 only indicated that she had a question about the

jury charge.  Id.  Juror #39 was instructed to submit her question

about the jury charge through a note from the foreman, which she

did, asking only "is knowingly or intending conspiracy to kidnap

[and] murder are [sic] charges in count five?"  (Id. at 13055; Court

-

Ex. 158.)  At no time did Juror #39 raise with the Court any allegations of outside influence or complaints about the course of jury deliberation.  On February 10, 2005, Juror #39 signed, along with all the other jurors, the verdict sheet with her number before it was presented in open court.  After the foreman announced the verdict, Jury #39 reaffirmed in response to the jury poll, along with all the other jurors, the verdict in open court.  (Tr. 13121-22.)

## II.

Defendants' first application is for a new trial pursuant to Fed. R. Cr. P. 33, or in the alternative, an evidentiary hearing with respect to the alleged misconduct of Juror #82.  Defendants argue that Juror #82 failed to disclose (1) that he had been in a jail for a couple of nights, and (2) that he believed that "if someone is in front of a judge on charges, it is because they had done something wrong."

### A.

#### 1.

Rule 33 of the Federal Rules of Criminal Procedure states that the trial court may grant a defendant's motion for a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 gives the court "broad discretion … to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."

-

<u>United States v. Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001) (quoting <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992)). "Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict…." <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995). Courts "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" <u>Ferguson</u>, 246 F.3d at 134 (quoting <u>Sanchez</u>, 969 F.2d at 1414). In addition, there is a strong presumption against setting aside jury verdicts based on accusations of juror misconduct. <u>See</u> <u>Tanner v. United States</u>, 483 U.S. 107, 120 (1987).

In evaluating motions for a new trial based on a juror's alleged failure to respond accurately to <u>voir dire</u> questions, the Supreme Court has set out the two-step <u>McDonough</u> test. <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 556 (1984). First, a party alleging such a claim must "demonstrate that a juror failed to answer honestly a material question on <u>voir dire</u>." <u>Id</u>. The failure to answer honestly must be deliberate; a "juror's good faith failure to respond, though mistaken, [does] not satisfy even the first prong of the test." <u>United States v. Shaoul</u>, 41 F.3d 811, 815 (2d Cir. 1994). Second, the party must "further show that a correct response would have provided a valid basis for a challenge for cause." <u>McDonough</u>, 464 U.S. at 556. The difficulty in meeting both prongs of the test is "evident from the fact that no verdict in the Second Circuit has been overturned on the basis of juror

-

nondisclosure under the McDonough test." United States v. Stewart, 317 F. Supp. 2d 432, 436-37 (S.D.N.Y. 2004).[1]

## 2.

The standard for conducting a post-verdict jury inquiry, such as an evidentiary hearing, is also demanding. As the Court of Appeals for the Second Circuit has noted, "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989).

The trial judge is accorded broad discretion in treating charges of jury misconduct. See Wheel v. Robinson, 34 F.3d 60, 65 (2d Cir. 1994). Courts should be reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983). "[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." Tanner, 483 U.S. at 120-

---

[1] Stewart noted that the Second Circuit Court of Appeals remanded only one case, United States v. Colombo, 869 F.2d 149 (2d Cir. 1989), for an inquiry into possible juror nondisclosure. Upon remand, the district court conducted a hearing and denied the defendant's renewed motion, a ruling that the Court of Appeals upheld. See Stewart, 317 F. Supp. 2d at 437-38.

21.  See also Chase Manhattan Bank, N.A. v. T&N plc, No. 87 Civ.
4436 (JGK), 1997 WL 221203 at *5 (S.D.N.Y. April 28, 1997).

Therefore, a post-trial evidentiary hearing into alleged juror
misconduct or extraneous influence is required only when a party
comes forward with "clear, strong, substantial and incontrovertible
evidence ... that a specific, non-speculative impropriety has
occurred."  Ianniello, 866 F.2d at 543 (internal quotation marks and
citation omitted); see also Moon, 718 F.2d at 1234; King v. United
States, 576 F.2d 432, 438 (2d Cir. 1978).

**B.**

The defendants' first allegation regarding Juror #82's
misconduct is that he failed to disclose that "he had been in jail
for a couple of nights when he was in the military."  Rather than
offering "clear, strong, substantial and incontrovertible evidence"
of this alleged fact, defendants offer hearsay testimony overheard
by a prospective juror on May 20, 2004, and transcribed in a
declaration dated May 24, 2005, over a year later.  The reliability
of this hearsay testimony is further undercut in that it was first
revealed after the verdict to defendant Stewart's counsel, rather
than to the Court.

Even assuming that this hearsay statement overhead by
Prospective Juror #76 is true, there is no evidence that Juror #82
deliberately answered any question dishonestly, as required by the

first prong of the McDonough test.  Any omission would be more
reasonably be construed as a mistake, especially given that Juror
#82 candidly disclosed the Article 15 disciplinary proceeding
against him in both answering the questionnaire and in voir dire
questioning, and further revealed that his brother had been
imprisoned.  (Juror #82 Questionnaire at 13, 18; Tr. 397-98.)  There
is, in fact, a difference between jail, which is normally considered
a place for pre-trial detention, and prison, where a convicted
defendant is incarcerated for rehabilitation.  See McGinnis v.
Royster, 410 U.S. 263, 272 (1973) (noting the difference between
county jails, which "serve primarily as detention centers," and
state prisons where "a serious rehabilitative program exists").
There was no question on the juror questionnaire about jail, and
certainly none about military jail.  In any event, it is doubtful
that Juror #82 would casually tell other prospective jurors that he
had been in jail for a couple of nights if he were deliberately
trying to withhold this same information from the Court in a sworn
response.

    Furthermore, the defendants have completely failed to satisfy
the second prong of the McDonough test, which requires a showing
that truthful disclosure would have provided a valid basis for a
challenge for cause.  In fact, the defendants concede in their reply
brief that the "mere fact that Juror #82 had been incarcerated when
he was in the military would not have formed a valid basis for

-

striking him for cause." (Stewart Reply Mem. at 12.) Additionally, Juror #82 had previously testified in response to voir dire questioning that nothing about his military experience or Article 15 disciplinary action would prevent him from being a fair and impartial juror in this case. (Tr. 397-98.)

Accordingly, the defendants' allegations regarding Juror #82's alleged time in jail do not support the motion for a new trial and fail to provide "clear, strong, substantial, and incontrovertible evidence" of any misconduct that would warrant an evidentiary hearing.

## C.

The defendants' second allegation against Juror #82 is that he deliberately withheld his belief that "if someone is in front of the judge on charges, it is because they had done something wrong." These allegations fail to meet the McDonough test because there is no evidence that Juror #82 deliberately answered any question dishonestly.

The defendants claim that Juror #82 deliberately misrepresented that he would accept the presumption of innocence, require the prosecution to bear the burden of proof, base his verdict solely on the evidence, and was otherwise able to serve as a fair and impartial juror (Questions 108-10, 113-115). The sole support for this claim is stale hearsay statement recalled merely "in substance"

over a year after it was made, which fails to provide a sufficient basis to conclude that the juror lied under oath in response to all of those questions.

Even assuming the hearsay statement is an accurate recollection, the juror's comment occurred immediately after the juror self-effacingly talked about his own experience in the military, and on its face, the substance of the comment only generally addressed people who appeared before judges. The casual comment was not directed to any defendants or issues in this case, and thus does not specifically contradict the juror's statements made under oath. Notably, the affidavit of Prospective Juror #76 does not indicate that she reported the comment to the Court or anybody else at the time. If Prospective Juror #76 believed the comment to be significant, plainly the time to raise it was before or immediately after she watched the jury be empanelled, not over a year later after the verdict was rendered.

There is no reasonable basis to conclude that Juror #82's responses under oath were not truthful, that he could not accept the legal principles he was required to accept, and that he decided the case based solely on the facts and the law. Juror #82 served conscientiously during a lengthy trial and there is no basis to require him to answer further questions.

Although the defendants avoid characterizing their request to "follow up" and conduct an inquiry regarding Juror #39 as a request for an evidentiary hearing, that is precisely what they seek.  Thus, the relevant standard for determining if post-verdict inquiry is necessary is whether there is "clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred."  <u>Ianniello</u>, 866 F.2d at 543.

However, Federal Rule of Evidence 606(b) bars any post-verdict inquiry into "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict … or concerning the juror's mental processes in connection therewith …."  Fed. R. Evid. 606(b). There is an exception regarding juror testimony "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."  <u>Id</u>.  This exception is a narrow one, because even when a juror attests to outside information, "the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." <u>Bibbins v. Dalsheim</u>, 21 F.3d 13, 17 (2d. Cir. 1994) (per curiam). "Where an extraneous influence is shown, the court must apply an

-

objective test, assessing for itself the likelihood that the influence would affect a typical juror." <u>Id</u>. (quoting <u>Miller v. United States</u>, 403 F.2d 77, 83 n. 11 (2d Cir. 1968)). <u>See also</u> <u>Ianniello</u>, 866 F.2d at 544 (directing consideration of effect of ex parte statements on a "hypothetical average jury").

**B.**

As an initial matter, the Government argues that the Court should not consider any information supporting the defendants' request that is contained in Ms. Shellow-Lavine's June 3, 2005 letter, because it was the result of an improper post-verdict juror interview. (Gov't Mem. at 39-46.) The Court of Appeals for the Second Circuit has unambiguously prohibited parties from questioning jurors after the verdict without at least notice to the Court and opposing counsel. <u>United States v. Schwarz</u>, 283 F.3d 76, 98 (2d Cir. 2002) ("[W]e have established the requirement that '[a]t a minimum, … notice to opposing counsel and the court should be given in all cases' before engaging in any post-verdict inquiry of jurors.") (quoting <u>United States v. Moten</u>, 582 F.2d 654, 665-66 (2d Cir. 1978)). <u>See also</u> <u>United States v. Brasco</u>, 516 F.2d 816, 819 n. 4 (2d Cir. 1975) (noting that in the context of a full-scale examination of jurors, "post-trial questioning of jurors must only be conducted under the strict supervision and control of the court ...." (internal quotation marks omitted)). Such a rule is necessary

-

because, as recognized in Moten, a "serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts." Moten, 582 F.2d at 665.

Defense counsel readily concedes that "[i]n hindsight, the interview never should have occurred," and attribute it to a "failure to communicate among counsel." (Stewart Reply Mem. at 30.) Counsel for Stewart candidly acknowledged that prior to the interview, "some counsel became aware of Schwarz," and that "[i]t is fair to conclude that had all counsel been aware of the language in Schwarz the interview would likely not have occurred." (6/9/05 Shellow-Lavine Ltr. at 2.) However, Schwarz merely restated a long-existing rule within the Second Circuit. See Moten, 582 F.2d at 665. Furthermore, it is clear that defense counsel for Stewart was well aware of the prohibition, because one defense lawyer stated at trial in the presence of all the defense lawyers, "as I understand it the practice has long been in this district that we are forbidden to go and seek out or talk to jurors." (Tr. 12394.)

In light of this clear rule and the fact that at least some defense counsel violated it, it would be proper to exclude from

-

consideration any information garnered from improper contacts with Juror #39. See Tanner, 483 U.S. at 126 (noting the district court had discretion to disregard a juror's affidavit obtained in clear violation of the court's order and local rule against juror interviews). Defense counsel argue that their clients should not be penalized for their misconduct. (Stewart Reply Mem. at 29-30.) Counsel for Sattar further argues that since they did not participate in the interview, their client should not be penalized for other counsel's behavior. Excluding the June 2 Dratel Declaration and the interview statements contained in the Shellow-Lavine letter would not be penalizing the defendants, but would only prevent them from receiving the benefit of statements to which they were not entitled.

Moreover, it is not only the interview statements contained in the Shellow-Lavine letter that is tainted by this post-verdict juror contact, but also the hearsay statements in the June 2 Dratel Declaration. The June 2 Dratel Declaration is based on statements that were obtained by defense counsel after he had indirect contact with the juror through Mr. Masef--without notice to the Court or opposing counsel. To allow parties to circumvent the holdings in Moten and Schwarz by using indirect parties would undermine the Second Circuit rule against prohibited juror interviews and still permit the evils that the rule seeks to avoid. See Moten, 582 F.2d at 665.

The Second Circuit Court of Appeals in <u>Schwarz</u> did consider
three affidavits from jurors that were obtained in violation of the
rule against juror interviews.  <u>Schwarz</u>, 283 F.3d at 98; <u>see also</u>
<u>Ianiello</u>, 866 F.2d at 534 (considering three juror affidavits).
This result supports the consideration of the March 25 letter,
irrespective of how it came to be submitted.  In addition, in light
of the Court of Appeals' decision to consider the affidavits in
<u>Schwartz</u>, the Court will also assess the June 2 Dratel Declaration
and the June 3 Shellow-Lavine letter in considering the request for
an evidentiary hearing.

**B.**

With respect to Juror #39's March 25 letter to the Court, the
letter alleges "My verdict came about only as a result of the fear
and intimidation I was made to feel for my life during the course of
deliberations."  (3/25/05 Juror #39 Ltr. at 1.)  On its face, the
letter plainly is intended to describe the course of jury
deliberations and its effect on the juror's mind or emotions "as
influencing the juror to assent to or dissent from the verdict," and
does not refer to any "extraneous prejudicial information" or
"outside influence."  Fed. R. Evid. 606(b).  The statements in the
letter are therefore barred by Fed. R. Ev. 606(b).

While it is true that there can be some conduct in the jury
room short of actual physical violence that may be admissible, <u>see</u>

<u>Andersen v. Miller</u>, 346 F.3d 315, 327 (2d Cir. 2003) ("credible allegations of threats of violence leveled by one juror by another would fall within this exception"), courts have imposed a very high threshold. <u>See</u> <u>id.</u> ("possible <u>internal</u> abnormalities in a jury will not be inquired into <u>except in the gravest and most important cases</u>") (emphasis in original; internal quotation marks and citation omitted).

The March 25 letter from Juror #39 fails to make a specific, credible allegation necessary to warrant further inquiry. In the letter, Juror #39 complains specifically only about verbal harassment by her fellow jurors. (3/25/05 Juror #39 Ltr. at 1 (complaining of a "relentless verbal assult [sic] on my person and my position").) Such "[t]estimony concerning intimidation or harassment of one juror by another falls squarely within the core prohibition of [Rule 606(b)]." <u>United States v. Stansfield</u>, 101 F.3d 909, 914 (3d Cir. 1996) (internal quotation marks omitted). <u>See also</u> <u>United States v. Wilson</u>, 534 F.2d 375, 378-79 (D.C. Cir. 1976) (noting that "evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict" is not evidence of "extraneous influence" and is within the rule excluding testimony by a juror that impeaches a verdict) (internal citation omitted).

Courts have refused to upset a jury's verdict over more specific and serious allegations than those alleged here. <u>See</u>,

-

e.g., Jacobson v. Henderson, 765 F.2d 12, 14-15 (2d Cir. 1985)

(affirming denial of habeas relief where petitioner submitted juror

affidavits alleging instances of "screaming, hysterical crying, fist

banging, name calling, and the use of obscene language" and

chairthrowing during deliberations); United States v. Grieco, 261

F.2d 414, 415 n.1 (2d Cir. 1958) (per curiam) (refusing to upset

verdict where juror testified that, during deliberations, fellow

juror "kept yelling all the time," "wouldn't let [her] talk" and

told her that she had "no commonsense," to point that she "had

chills" and was "sick," "upset" and "practically in a daze" and that

she now wished to retract; "We do not say that there can be no

threats short of violence by one juror against a recalcitrant

dissenter that will upset a verdict, but certainly there was nothing

in the case at bar to justify such action."); see also United States

v. Stoppelman, 406 F.2d 127, 133 (1st Cir 1969.) ("The fact that

some jurors have weaker wills than others--or that one individual

may bow to the pressure of eleven--cannot be a cause for reopening a

case.").

Moreover, there is an independent reason to discount the

allegations in the letter.  On the day before the verdict, Juror #39

asked to see the Court, and the Court held an individual conference

with the juror (with counsel for the defense and Government present)

where the juror said she wanted to write a note about a

"clarification" of a "charge."  (Tr. 13054-56.)  Thereafter, Juror

-

#39 submitted a note to the Court asking about a conspiracy charge, which the Court answered.  (Court Ex. 158.)  At no point did the juror complain about the course of deliberations or suggest that anything untoward was happening or had happened.  In refusing to overturn the jury's verdict, the courts in <u>Andersen</u>, 346 F.3d at 330, and <u>Jacobson</u>, 765 F.2d at 15, specifically noted that the complaining jurors "had several opportunities to communicate directly with the court," but failed to do so.  Similarly here, the fact that Juror #39 had direct access to the Court and did not complain of any problems supports the conclusion that these allegations are post hoc efforts caused by dissatisfaction that do not require further post-verdict inquiry.

### c.

Finally, there are the allegations of outside influence that Ms. Shellow-Lavine reported in her June 3 letter to the Court that were allegedly said by the juror at her meeting with the defense lawyers on April 26, 2005, and the statements by the juror's lawyer to Mr. Dratel reported in the June 2 Dratel Declaration.  These statements do not rise to the necessary level of "clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred."  <u>Ianniello</u>, 866 F.2d at 543

Ms. Shellow-Lavine's statement about what the juror said were hearsay, and Mr. Dratel's were double hearsay.  The juror did not

-

include any of these allegations of outside influence in any affidavit, or even in her letter to the Court. Additionally, the statements of outside influence are internally inconsistent. As Ms. Shellow-Lavine acknowledged in her June 3 letter about the juror's statement at the meeting, "the sum and substance of what she said differed not only from what she wrote to the Court, but also what Mr. Masef had told Mr. Dratel." (6/03/05 Shellow-Lavine Ltr. at 2.) The change in the statements attributed to the juror is particularly significant, because while the prior double hearsay appeared to attribute a comment in the course of jury deliberations, the final statement to Ms. Shellow-Lavine discussed a comment allegedly made on the very last day of deliberations. This alleged outside comment would have been made despite juror security having been tightened after an incident with a van driver. Finally, as discussed above, Juror #39 was readily able to submit notes and meet individually with the Court, and had done so the day before the verdict was rendered, yet the juror failed to inform the Court about this alleged comment or ask for any other conferences.

The increased jury security, taken with the juror's conference with the Court, the subsequent note to the Court, and the substance of the juror's March 25 letter all undercut the hearsay (and double hearsay) allegations as to any prejudicial outside influence. There is no support for the earlier double hearsay comment reported by Mr. Masef to Mr. Dratel alleging involvement of court personnel, given

that it was not contained in the juror's letter to the Court or the subsequent interview.  Furthermore, even if the hearsay testimony of the final comment is accurate, the final alleged comment heard by Juror #39 would not rise to the level of a comment that would affect a reasonable juror.  The juror asserts hearing somebody identifying her and saying "that's the holdout."  (6/03/05 Shellow-Lavine Ltr. at 2.)  This comment contained no threat.  The defendants make much of the fact that the jurors were anonymous, but there is nothing about the comment that reveals the identity of the juror or even relates to the anonymity of the jury.

Thus, without any "clear, strong, substantial and incontrovertible evidence" of a threat or other prejudicial outside influence, the Court follows the Supreme Court's admonition to shield jury deliberations from public scrutiny.  As the Supreme Court has repeatedly directed:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation--to the destruction of all frankness and freedom of discussion and conference.

Tanner, 483 U.S. at 119-20 (internal citation and quotation marks omitted)). Juror #39's verdict was "solemnly made and publicly returned" through a signed verdict form and reaffirmed in open court, and there is no basis to attack it.

## CONCLUSION

For the reasons stated above, the defendants' applications are **denied.**

**SO ORDERED.**

**Dated:**  **New York, New York**
        **October 24, 2005**

**John G. Koeltl**
**United States District Judge**