

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 21, 2022

BY ECF

Honorable John G. Koeltl
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

> Re: **United States v. Ahmed Abdel Sattar**
> **02 Cr. 395 (JGK)**

Dear Judge Koeltl:

The Government respectfully submits this letter in response to defendant Ahmed Abdel Sattar's submission objecting to the United States Probation Office's proposed modifications of his conditions of supervised release. (*See* Dkt. 1092.) For the reasons stated below, the Court should overrule each of Sattar's objections and modify his conditions of supervision.

The Probation Office has requested that the Court modify Sattar's current conditions of supervised release and impose additional conditions requiring Sattar (1) to participate in a mental health treatment program approved by the Probation Office; (2) to participate in polygraph examinations to obtain information necessary for risk management and correctional treatment; (3) to cooperate with the Probation Office's Computer and Internet Management/Monitoring ("CIMP") program; (4) to report to the Probation Office any and all electronic communications service accounts used for user communications, dissemination and/or storage of digital media files; (5) not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to any organized crime group, gangs or any other criminal enterprise and frequent any establishment, or other locale where these groups may meet; and (6) be monitored by location monitoring for a period of six months.

## Background

Sattar was found guilty of terrorism-related offenses following a nine-month jury trial before this Court, that commenced on May 19, 2004 and ended on February 10, 2005. He was convicted of solicitation of crimes of violence, in violation of 18 U.S.C. § 373, conspiracy to kill persons in a foreign country, in violation of 18 U.S.C. § 956, and conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The Court sentenced Sattar on October 16, 2006, principally to 288 months' imprisonment to be followed by a five-year term of supervised release.

The evidence at trial established that for over a two-year period, Sattar and his co-defendants were the hub of a communications network that enabled a convicted and imprisoned terrorist, Sheikh Omar Abdel Rahman, to perpetuate his position as the leader of his terrorist organization, the Islamic Group, despite his conviction for seditious conspiracy to wage a war of urban terrorism against the United States, and despite the United States government's entirely appropriate efforts to cut Abdel Rahman off from the Islamic Group after that conviction. From their position at the hub of the communications network, Sattar and his two trial co-defendants received messages from leaders of the Islamic Group around the world, smuggled those messages to Abdel Rahman in prison, received Abdel Rahman's responses to those messages, relayed those responses back to the Islamic Group leaders, and, in the case of Abdel Rahman's withdrawal of support for the Islamic Group's unilateral cease-fire against the Egyptian government, even broadcast those responses to the news media for dissemination around the world. In other words, Sattar and his co-defendants ensured that, even while incarcerated and subject to restrictions on his communications with the outside world known as "Special Administrative Measures," or SAMs, Abdel Rahman would continue to provide leadership to the Islamic Group.

The nature of the Islamic Group, its terrorist activities – which included the murders of tourists visiting Egypt such as at Luxor, and all that it stands for was well known to Sattar. Indeed, Sattar agreed with certain Islamic Group leaders that the Group should abandon its cease-fire and resume the use of violence, a goal he furthered by issuing a *fatwah* in Abdel Rahman's name that advocated the murder of Jews and by urging an Egyptian militant to carry out a terrorist attack.

As the Court will recall, the Government established Sattar's guilt by presenting extensive evidence, consisting primarily of recorded telephone conversations among Sattar and his co-defendants and between Sattar and other co-conspirators, audio- and video-recordings of visits that Sattar's co-defendants paid to Abdel Rahman in prison, documents seized from the homes of Sattar and one of his co-defendants and from the law office of his other co-defendant, and certain exhibits from Abdel Rahman's trial.

## Applicable Law

A district court may impose any condition of supervised release that "it considers to be appropriate." 18 U.S.C. § 3583(d). Such condition must be:

> "reasonably related to (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

U.S.S.G. § 5D1.3(b). "Despite the use of the conjunctive in the Guidelines, a condition may be imposed if it is reasonably related to any one or more of the specified factors." *United States v. Brown,* 402 F.3d 133, 137 (2d Cir. 2005) (internal quotation marks omitted). In addition, the condition must "involve no greater deprivation of liberty than is reasonably necessary for the" relevant sentencing purposes, and must be "consistent with any pertinent policy statements issued

by the Sentencing Commission." U.S.S.G. § 5D1.2(b). Ultimately, the district court has "broad discretion to tailor conditions of supervised release." *United States v. Gill,* 523 F.3d 107, 108 (2d Cir. 2008) (internal quotation marks omitted); *see also United States v. MacMillen,* 544 F.3d 71, 74 (2d Cir. 2008) ("A district court retains wide latitude in imposing conditions of supervised release.").

While a district court's power to impose conditions of supervised release is broad, it is not delegable; rather, the district court must impose the condition of supervised release, although it may delegate the implementation of that condition to the discretion of the probation officer. *See, e.g., United States v. Matta,* 777 F.3d 116, 123 (2d Cir. 2015) (holding that "'[i]n light of this difference [between inpatient and outpatient treatment], . . . granting the probation officer the discretion to decide whether such conditions will be imposed is tantamount to allowing him to decide the nature or extent of the defendant's punishment,' and that 'any condition that affects a significant liberty interest, such as one requiring the defendant to participate in residential treatment . . . must be imposed by the district court and supported by particularized findings that it does not constitute a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing.'" (quoting *United States v. Mike,* 632 F.3d 686, 695-96(10th Cir. 2011))); *United States v. Peterson,* 248 F.3d 79, 85 (2d Cir. 2001) (holding that two special conditions – delegating to the probation officer the decision whether to require sex offender counseling and the decision whether to require third-party notifications – were impermissible delegations of judicial authority); *United States v. Genovese,* 311 F.App'x 465, 467 (2d Cir. 2009) (holding that there was no error where "the instant [sex offender and/or mental health] condition makes clear that Genevese is to participate in some sort of treatment; [and] the court has done 'nothing more than to delegate to the probation officer details with respect to the selection and schedule of the program.'" (quoting *Peterson,* 248 F.3d at 85)). "In other words, the extensive 'supervision mission' of federal probation officers includes 'execut[ing] the sentence,' but not imposing it." *Matta,* 777 F.3d at 122 (citation omitted) (quoting *United States v. Reyes,* 283 F.3d 446, 456 (2d Cir. 2002)).

Before imposing a condition of supervised release, a district court must conduct an "individualized assessment" and state on the record its reasons for imposing it. *United States v. Betts,* 886 F.3d 198, 202 (2d Cir. 2018). A condition of supervised release must be sufficiently clear to put an ordinary person on notice of the required or prohibited conduct. *United States v. Carlineo,* 998 F.3d 533, 536 (2d Cir. 2021). A condition is too vague if it requires a reasonable person to speculate as to its meaning. *Id.* (citing *Untied States v. Reeves,* 591 F.3d 77, 80-81 (2d Cir. 2010)).

### Discussion

Sattar objects to the Probation Office's requested modifications that he (1) participate in a mental health treatment program; (2) participate in polygraph examinations to obtain information necessary for risk management and correctional treatment; (3) cooperate and participate in the CIMP program; (4) not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to any organized crime groups, gangs or any other criminal enterprise including organizations which advocate terrorism; and (5) be monitored by location monitoring for a period of six months.

**Mental Health Treatment**

Sattar objects to the condition that he participate in a mental health treatment program because it does not relate to any of the four factors listed in Guidelines Section 5D1.3; the Court has not made an "individualized assessment" that this condition is appropriate; and the request for this condition has no specifics as to the type of mental health treatment. These claims are meritless.

The requirement that Sattar participate in mental health treatment is directly related to the nature and circumstances of his offenses and his history and characteristics. As noted above, Sattar was convicted of terrorism-related offenses: solicitation of crimes of violence and conspiracy to kill persons in a foreign country. The evidence at trial established that Sattar agreed with certain leaders of the Islamic Group, including Rifa'I Taha Musa ("Taha"), the most virulent and militant leader of the Group, who advocated for an end to the cease-fire and the resumption of violence. (*See* GX 1707X at 33-36). To further that goal, Sattar and Taha drafted and issued a *fatwah* in Abdel Rahman's name calling for the killing of all Jewish people "wherever they are." (*See* GX 1179X-83X; GX 1182X at 13-17). They then relayed the *fatwah* to Alaa Abdul Raziq Atia, the military leader of the Islamic Group, and told him to "go by" it, in other words, to carry out the mandate and kill Jewish people. (*See* GX 1191X, GX 1194X, GX 1197X, GX 1188X). As the Court previously noted, Sattar's conduct resulting in his conviction "would likely have led to the loss of life had it not been interdicted by foreign law enforcement authorities." (*See* Dkt. 1089, at 10-11). That Sattar participated in a conspiracy to murder innocent people clearly calls into question his mental health. Therefore, requiring him to participate in mental health treatment is reasonably related to the nature and circumstances of his crimes and his history and characteristics.

Sattar's complaint that the Court has not made an "individualized assessment" that mental heath treatment is an appropriate condition is premature. The Court can make that finding at the scheduled conference on June 28. His claims that the request for this condition does not specify the type of mental health treatment does not make it impermissibly vague or represent a delegate of authority to the Probation Office. The condition makes clear that Sattar is to participate in some mental health treatment and the Court can delegate to the Probation Office the details with respect to the program. *See United States v. Genovese,* 311 F.App'x at 467; *United States v. Peterson,* 248 F.3d at 85. The Court need not micromanage every facet of Sattar's supervision and may delegate to a probation officer decisionmaking authority over certain details of supervised release. "[W]hether a defendant is required to attend . . . mental health counseling *at all* must be decided by the district court . . . [b]ut decisions about the details of such treatment . . . can be left to the probation officer," to the extent that they do not materially limit the defendant's freedom any more than a court's order already does. *United States v. Villa-Lozada,* 973 F.3d 147, 152-53 (2d Cir. 2020).
Furthermore, Sattar cites no authority for the proposition that there need be a finding that he suffers from a mental health condition before the Court can impose this condition.

**Polygraph Examination**

Sattar next objects to the proposed condition that he submit to polygraph examinations so that the Probation Office can obtain information necessary for risk management and correctional

treatment on vagueness and Fifth Amendment grounds and because the condition provides no details regarding the substance of questions that will be posed to him. These claims are also meritless.

To begin with, this condition of supervised release is directly related to Sattar's criminal conduct in this case and, therefore, is an appropriate and necessary condition of supervised release. As the Court will recall, Sattar engaged in various acts of dishonesty in committing the crimes for which he was convicted and also committed perjury in his trial testimony. Sattar, with his two co-defendants, was convicted of participating in a conspiracy to defraud the United States. As this Court previously found, the defendants each "knew of the existence of the SAMs and the limitations the SAMs placed on Abdel Rahman's ability to communicate with others," and that "despite this knowledge, the defendants acted together to employ deceitful and dishonest means toward the Department of Justice and the Bureau of Prisons to obstruct the administration and enforcement of SAMs upon Abdel Rahman." *United States v. Sattar,* 395 F. Supp.2d 79, 85 (S.D.N.Y. 2005). Sattar and his co-defendants "did this primarily by smuggling messages to and from Abdel Rahman and by disseminating his statements to the media in the form of two press releases in June 2000, announcing his withdrawal of support for a cease-fire." *Id.* at 85.

Sattar engaged in another act of deceit and dishonesty between August 2000 and May 2001. During that time, Sattar learned from Abdel Rahman's wife during a telephone conversation that Abdel Rahman was refusing to eat and to take his insulin and medication and that the medical staff at the Federal Medical Center Rochester had asked her to try to persuade him to take his medication. (*See* GX 1219X, at 2). During that same telephone conversation, Sattar also spoke with Abdel Rahman's son, Abdullah, who told Sattar that he wanted to publicize falsely that Abdel Rahman was being denied his medication. (*See* GX 1219X, at 24). Despite the fact that such a press release would contain knowingly false information -- and, indeed, inflammatory information that risked causing Abdel Rahman's followers to engage in violent reprisals – Sattar and Yassir Al-Sirri, an Islamic Group adherent based in London who operated a website there, composed a statement complaining falsely that Abdel Rahman was "denied his right to take his insulin" (*See* GX 1221X, at 1-15), and disseminated the statement in a press release to the media (*See* GX 1221X, at 16, 19, 24-25, 35-36; GX 1224X, at 3-7).

Finally, Sattar knowingly and intentionally made numerous false statements during his trial testimony in this case. As a result, at Sattar's sentencing proceeding, the Court granted the Government's request for a two-level enhancement of his offense level for obstruction of justice based on that perjured testimony. The Court found that "there were numerous statements that the defendant made that were false and that were belied by the documentary evidence and could not have been the result of confusion, mistake or faulty memory." Given Sattar's record of dishonesty and deceit as it relates to this case, requiring him to take polygraph examinations to assist the Probation Office in obtaining information necessary for risk management and correctional treatment is warranted.

The Second Circuit has recognized that the use of polygraph testing may serve a salutary purpose in the supervised release context, in that it may provide an added incentive for an offender to furnish truthful statements to probation officers that would assist the officers in their supervision and monitoring of a defendant. *See United States v. Johnson,* 446 F.3d 272, 277 (2d Cir. 2006).

The Court noted that "the incremental tendency of polygraph testing to promote such candor furthers the objectives of sentencing by allowing for more careful scrutiny of offenders on supervised release . . . and have also been found to assist another sentencing objective: 'ensur[ing] compliance with probationary terms.'" *Id.* (citation omitted). Polygraph conditions also further sentencing objectives, such as rehabilitation and deterrence. *Id.* at 278. The Second Circuit has also held that the requirement that a defendant take a polygraph test as a condition of supervised release does not violate the Fifth Amendment because the defendant retains the right to later challenge any resulting self-incrimination in court. *Id.* at 280; *see also Asherman v. Meachum,* 957 F.2d 978, 982-83 (2d Cir. 1992) (en banc).

There is simply nothing vague about the proposed condition that the defendant submit to polygraph testing. Nor is there a requirement that the Court specify the questions that can be posed to Sattar. The delegation to the Probation Office as to the questions to be asked of Sattar and other details of the testing is perfectly proper and does not delegate to that Office decision-making authority which would make the defendant's liberty itself contingent on a probation officer's exercise of discretion. *See United States v. Matta,* 777 F.3d at 122.

### Participation in the CIMP Program

Sattar also objects to the proposed condition that he cooperate and participate in the CIMP program because it is not reasonably related to any of the four sentencing factors as it relates to supervised release. In support of this claim, Sattar argues that he communicated with Islamic Group members by landline telephone during the course of his crimes in this case and that the persons he communicated with during the course of his crimes in this case are either deceased or apparently no longer a threat. Sattar's claims are meritless.

Sattar's participation in the CIMP program is directly related to the nature and circumstances of the crimes he committed in this case. As the Court will recall, Sattar communicated with Islamic Group leaders and members who were in the Middle East, the United Kingdom, and other parts of the world from his home in New York. While it is true that he frequently communicated with Islamic Group leaders and his co-defendants by telephone, he also used email to communicate with Taha, the most militant leader of the Islamic Group who advocated for an end to the cease-fire. For example, Taha sent Sattar via email an early draft of Taha's book, which was dedicated to Abdel Rahman, among others, and called for the killing of tourists, Egyptian government personnel, Americans, Jews, and Christians. (*See* GX 2202T; GX 2700T). Thus, having used the internet as a means of communicating with a terrorist-co-conspirator in committing his crimes in this case, it is appropriate that Sattar be required to participate in the CIMP program.

Sattar's claim -- that the people he communicated with during his commission of his crimes may be dead or no longer considered a threat – is irrelevant as to whether this condition is appropriate. Conditions of supervised release are not limited to prohibiting contact with prior criminal associates and Sattar fails to cite any authority that supports that proposition.

**Associating With Any Individual Affiliated To An Organized Crime Group, Gangs, or Any Other Criminal Enterprise**

Sattar next objects to the requested condition restricting him from associating in person, through mail, electronic mail or telephone with any individual with an affiliation to any organized crime groups, gangs or any other criminal enterprise. He argues that this condition should fail because several of the terms used to describe it are vague and it violates his First Amendment right of free speech. Sattar is wrong on both counts.

Due process requires that conditions of supervised release be "sufficiently clear to inform [the defendant] of what conduct will result in his being returned to prison.' *United States v. Simmons,* 343 F.3d 72, 81 (2d Cir. 2003). A condition of supervise release is unconstitutional if it is so vague that people "of common intelligence must necessarily guess as its meaning and differ as to its application. *Id.* However, conditions need not be clear beyond any possible dispute; they "need not be cast in letters six feet high, or describe every possible permutation, or spell out every last self-evident detail. *United States v. Johnson,* 446 F.3d 272, 280 (2d Cir. 2006); *United States v. MacMillen,* 544 F.3d at 76. They must provide the defendant sufficient notice of what conduct is prohibited "even if they are not precise to the point of pedantry." *Johnson,* 446 F.3d at 280.

This condition is clearly appropriate because it relates directly to Sattar's criminal conduct in this case, in that he associated with the Islamic Group, an Egyptian based terrorist organization. This condition is also reasonably related to the defendant's rehabilitation and to the protection of the public. Contrary to Sattar's claim, this condition is not vague because the only reasonable understanding of the condition is that it prohibits association with groups engaged in regular criminal activity. *United States v. Marshall,* 808 Fed. Appx. 11, 1 (2d Cir. 2020) (finding that a condition of supervised release prohibiting the defendant's association with a "criminal gang, club, or organization" was not impermissibly vague). Sattar's complaint that some of the terms used in the condition, including the words "associate" and "frequent," are constitutionally vague is similarly meritless. The Second Circuit has held the word "associate" -- in the context of a parole condition that a defendant not associate with persons having criminal record – was not unconstitutionally vague because the term is not so uncertain that persons of "common intelligence must necessarily guess at its meaning." *Birzon v. King,* 469 F.2d 1241, 1243 (2d Cir. 1972).[1] The same can be said of the word "frequent," which means to associate with, be in, or resort to often or habitually. *See* https//www.merrion-webster.com/dictionary. It should also be noted that while Sattar claims this condition is unconstitutionally vague, he has not suggested any alternative interpretation.

Sattar's claim that this condition violates his First Amendment rights to free speech and free exercise of his religion is likewise meritless. It is undisputed that constitutional rights, including First Amendment rights, may to some extent be limited during a defendant's term of supervised release. *United States v. Bolin,* 976 F.3d 202, 214 (2d Cir. 2020), *Farrell v. Burke,* 449 F.3d 470, 497 (2d Cir. 2006). The government can infringe the First Amendment rights of a defendant "so

---

[1] The word "associate" means to join as a partner, friend, or compassion. *See* https//www.merrion-webster.com/dictionary.

long as the restrictions are reasonably and necessarily related to the advancement of some justifiable purpose of supervised release. *Farrell v. Burke,* 449 F.3d at 497; *Birzon v. King,* 469 F.2d at 1243. In Sattar's case, the government retains a substantial interest in insuring that its rehabilitative goal is not frustrated and that the public is protected. Accordingly, this condition does not violate Sattar's First Amendment rights. With respect to his claim that this condition also violates his free exercise of religion, the condition explicitly excludes "houses of worship" from places that he is prohibited from frequenting.

Finally, while Sattar notes that the condition does not specify any particular *mens rea,* it is assumed that the condition complies with "constitutionally required limitations on the breath of 'association,' including that the prohibition only limits association with" [individuals with an affiliation with criminal entities known to Sattar] and excludes incidental contacts." *United States v. Green,* 618 F.3d 120, 123 (2d Cir. 2010); *United States v. Marshall,* 808 Fed. Appx. at 13, fn. 3.

### Location Monitoring

Finally, Sattar objects to the condition that he be monitored by location monitoring for a six-month period because he has already been on supervised release for approximately six months and claims he has been overly compliant and communicative about his whereabouts. This is an appropriate condition as it reasonably relates to Sattar's rehabilitation and the protection of the public. In determining whether Sattar has been compliant with supervised release, the Probation Office should not have to rely upon Sattar's own representations. The condition is not vague, as Sattar claims, because it does not identify the technology to be used. The choice of technology involves the implementation of this condition and is properly left to the Probation Office.

### Conclusion

For the reasons stated above, the Court should modify Sattar's conditions of supervised release as requested by the Probation Office.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


by:   s/Andrew S. Dember
    Andrew S. Dember
    Assistant United States Attorney
    (212) 637-2563